EVANS, Regional Director of Ninth Region of National Labor Relations Board, v. INTERNATIONAL TYPOGRAPHICAL UNION et al.

Civil Action No. 1587.

District Court, S. D. Indiana, Indianapolis Division.

Feb. 25, 1948.

---

Robert N. Denham, Gen. Counsel, David P. Findling, Associate Gen. Counsel, and Winthrop A. Johns, Trial Atty., all of Washington, D. C., and Allen Sinsheimer, Jr., Atty., National Labor Relations Board, of Cincinnati, Ohio, for petitioner.

Van Arkel & Kaiser, Henry Kaiser, and Gerhard P. Van Arkel, all of Washington, D. C., and Clarence R. Martin, of Indianapolis, Ind., for respondents.

Elisha Hanson, and William K. Van Allen, both of Washington, D. C., and Wray E. Fleming, of Indianapolis, Ind., for American Newspaper Publishers Ass'n, amicus curiae.

Gerard D. Reilly, and Charles Edward Rhetts, both of Washington, D. C., and John K. Ruckelshaus, of Indianapolis, Ind., for Inland Daily Press Ass'n, amicus curiae.

Thurman Arnold, Paul Porter, and Arnold, Fortas & Porter, all of Washington, D. C., and Baker & Daniels and G. R. Redding, all of Indianapolis, Ind., for Southern Newspaper Publishers' Ass'n, amicus curiae.

Thomas F. O'Mara, of Terre Haute, Ind., for Chicago Typographical Union No. 16, amicus curiae.

Welly K. Hopkins, of Washington, D. C., for United Mine Workers of America, amicus curiae.

Lee Pressman, Gen. Counsel, and Frank Donner, Asst. Counsel, both of Washington, D. C., for Congress of Industrial Organizations, amicus curiae.

Padway, Woll, Thatcher & Glenn and Herbert S. Thatcher, all of Washington, D. C., for American Federation of Labor, amicus curiae.

Jerome Y. Sturm, of New York City, for International Ass'n of Machinists, amicus curiae.

SWYGERT, District Judge.

This is an action brought pursuant to Section 10(j) of the National Labor Relations Act, as amended by the Labor Management Relations Act, 1947, § 101, 29 U.S.C.A. § 160(j). This section provides substantially that the National Labor Relations Board, after issuance of a complaint under the provisions of Section 10(b) of the Act charging the commission of an unfair labor practice, may petition a federal district court "for appropriate temporary relief or restraining order." A petition has been filed pursuant to this statutory authority and upon the issuance of a rule to show cause why the relief prayed for in the petition should not be granted, the respondents have moved to dismiss this action on two grounds. It is their first contention that Section 10(j) of the Act is unconstitutional because it is repugnant to Article III, § 1 and § 2, and the Fifth Amendment to the Constitution of the United States. Their second contention is that the National Labor Relations Board itself, rather than its Regional Director or the General Counsel, is the only party which may properly petition for the relief sought, and that the Board has unlawfully attempted to delegate to the Regional Directors its powers under Section 10(j).

■ The authority of courts of equity to grant interlocutory relief pending a final adjudication is of ancient origin and needs no support of cited authority. The application for such interlocutory relief need not be confined to the tribunal to which the final determination of the principal issues is committed. Looney v. Eastern Texas R. R. Co., 1918, 247 U.S. 214, 38 S.Ct. 460, 62 L.Ed. 1084; Erhardt v. Boaro, 1885, 113 U.S. 537, 5 S.Ct. 565, 28 L.Ed. 1116; Eastern Texas Ry. Co. v. Railroad Commission of Texas, D.C., 1917, 242 F. 300; Northern Pac. Ry. Co. v. Soderberg, C.C., 1898, 86 F. 49. There is thus no novelty in the provision for the separation of the adjudication of the principal action by one tribunal under Section 10(b) and the proceeding before a different tribunal to obtain interlocutory relief under Section 10(j). However, the question remains whether the ancillary action to obtain interlocutory injunctive relief as authorized under Section 10(j) is a "case" or "controversy" in the Constitutional sense.

■ In construing the limitation of the judicial power of constitutional courts to "cases" and "controversies," the Supreme Court in Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, at pages 240, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617, 108 A.L.R. 1000, said:.

"A 'controversy' in this sense must be one that is appropriate for judicial determination. Osborn v. United States Bank, 9 Wheat. 738, 819, 6 L.Ed. 204. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. United States v. Alaska S. S. Co., 253 U.S. 113, 116, 40 S.Ct. 448, 449, 64 L.Ed. 808. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. South Spring Gold Co. v. Amador Gold Co., 145 U.S. 300, 301, 12 S.Ct. 921, 36 L.Ed. 712; Fairchild v. Hughes, 258 U.S. 126, 129, 42 S.Ct. 274, 275, 66 L.Ed. 499; Massachusetts v. Mellon, 262 U.S. 447, 487, 488, 43 S.Ct. 597, 67 L.Ed. 1078. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

In applying this statement to the case at bar, the question is narrowed to whether an interlocutory decree granted in a proceeding under Section 10(j) is "of a con-

clusive character." That is, is it final and conclusive when the court that acts on the application for such interlocutory equitable relief does not have jurisdiction to hear and adjudicate the issues of the principal or parent action, which issues are presented to and must be decided by an administrative agency?

While the jurisdiction of the district court under Section 10(j) is confined to the granting of interlocutory relief, its decision is final and conclusive as to the application for such relief, except as that decision may be reviewed on appeal. This finality, of course, does not preclude the revision or modification of its decree by the district court pending the determination of the principal controversy by the Board. Milk Wagon Drivers Union v. Meadowmoor Co., 1941, 312 U.S. 287, 298, 61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200.

When the decision of a district court in a proceeding under Section 10(j) for interlocutory relief is viewed in its relation to the primary proceeding under Section 10(b), it is neither final nor conclusive as to the issues there presented. It is not final because the standard of inquiry in Section 10(j) is the probability of the existence of facts, while the decision of the Board in a Section 10(b) proceeding must rest upon a full hearing and a measure of proof and inquiry extending beyond the standard of probability. The decision of the district court is not res judicata upon the final hearing of an administrative complaint, because in an application for interlocutory and temporary relief under Section 10(j), the court does not undertake to pass upon the merits of the principal controversy. That lies within the province of the Board. The district court determines only whether temporary relief or a restraining order should be granted during the pendency of an adjudication of the issues by the Board. However, these elements of inconclusiveness and lack of finality are inherent in any decision granting interlocutory equitable relief pendente lite. And these factors do not render the proceeding for such relief any the less a "case" or "controversy" within the meaning of the Constitution, because they exist, not as infirmities of the interlocutory judgment, but only in relation to the principal proceeding.

The respondents also contend that because the proceeding under Section 10(j) is previous in time to final administrative action, the jurisdiction of the district court involves an exercise of legislative or administrative functions of a non-judicial character. In the brief filed in support of their motion, this contention is stated thus: "If the court intervened before the administrative process was completed it (1) would be exercising non-judicial functions and (2) it could not render a final judgment, since there would obviously remain something more to be done by the administrative agency." The petitioner correctly points out in his brief that whether the court's functions under Section 10(j) are judicial, rather than legislative or administrative, does not depend upon whether they are auxiliary to the legislative or administrative process, but whether they are essentially judicial in character. The "question depends * * * upon the character of the proceedings." Prentis v. Atlantic Coast Line, 1908, 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150.

In Interstate Commerce Commission v. Brimson, 1894, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047, it was firmly established that a proceeding in a United States Court to compel a witness to testify before an administrative agency is a case or controversy in the constitutional sense and that such functions do not impose non-judicial duties upon constitutional courts. At page 487 of 154 U.S., page 1137 of 14 S.Ct., 38 L.Ed. 1047, the Supreme Court declared:

"The present proceeding is not merely ancillary and advisory. It is not, as in Gordon's case [Gordon v. United States, 117 U.S. 697], one in which the United States seeks from the circuit court of the United States an opinion that 'would remain a dead letter, and without any operation upon the rights of the parties.' The proceeding is one for determining rights arising out of specified matters in dispute that concern both the general public and the individual defendants. It is one in which a judgment may be rendered that will be conclusive upon the parties until reversed by this

court; and that judgment may be enforced by the process of the circuit court. * * * It will be as much a judgment that may be carried into effect by judicial process as one for money, or for the recovery of property, or a judgment in mandamus commanding the performance of an act or duty which the law requires to be performed, or a judgment prohibiting the doing of something which the law will not sanction. It is none the less the judgment of a judicial tribunal dealing with questions judicial in their nature, and presented in the customary forms of judicial proceedings, because its effect may be to aid an administrative or executive body in the performance of duties legally imposed upon it by Congress in execution of a power granted by the constitution."

Likewise, in a proceeding under Section 10(j), the decision of the court would be "none the less the judgment of a judicial tribunal dealing with questions judicial in their nature, and presented in the customary forms of judicial proceedings" because it is auxiliary to a proceeding before an administrative body.

Further, respondents' argument tends to defeat itself when inquiry is made into the essential nature of the administrative process which the temporary relief is sought to aid. Congress by the Labor Management Relations Act, 1947, has created a specialized administrative tribunal to adjudicate matters arising in the field of labor relations and to perform functions of a distinctly judicial character. A proceeding under Section 10(b) imposes duties upon the Board requiring the exercise of that function, rather than its powers of an executive or legislative nature. Therefore, upon respondent's theory, it could hardly be successfully contended that when a federal district court exercises its equitable powers under Section 10(j) in the granting of interlocutory relief, it is performing anything less than a judicial function.

Finally, the respondents contend that the procedure under Section 10(j) deprives them of their rights without due process of law, in contravention of the Fifth Amendment. They assert that the fundamental essentials of due process are lacking because the final determination of the issues must be made by the Board after a full hearing rather than by the court from which interlocutory equitable relief is sought, and that since the court is not in control of the principal proceeding or able to compel a final decision, the rights of the respondents may be affected finally and irrevocably in a proceeding in which the merit of the issues is not determined and which involves less than the full hearing that must be accorded a final adjudication.

The fatal weakness of this contention is two-fold. First, respondents' argument, if valid, is applicable to any and every exercise of the power of a court of equity to grant interlocutory injunctive relief to preserve the status quo pending an adjudication of the merits of a controversy. Its maintenance would cast a presumption of a lack of due process upon every equitable proceeding which undertakes to grant such relief. In sum, the proceedings would be tested for due process not at its conclusion, but at its start. Such contention in respect to this type of remedy is, of course, untenable. Second, Section 10(j) provides that the court may grant such temporary relief or restraining order as it "deems *just* and *proper*." (Emphasis supplied.) There is nothing in this section or in the other parts of the Act indicating that the court, in granting to the Board temporary relief or a restraining order, may not mold its decree in such fashion as not only to achieve an expeditious determination by the Board, but also to avoid if possible determining in effect the actual merits of the issues which the statute requires the Board, and not the Court, to adjudicate. Rather, the Act permits the court to render that equitable relief which it deems just and proper as indicated by the circumstances of the particular case, so that public rights, as well as private rights, are protected during the pendency of the controversy before the Board.

The second ground of the motion to dismiss requires an interpretation of the statute. Section 10(j) of the Act, under which this suit is brought, provides that "The Board shall have power" to petition the district court for equitable relief. The present action has been instituted by a

regional director "for and on behalf of the Board," presumably in compliance with Section 202.35, Series 5, of the Rules and Regulations of the National Labor Relations Board. This rule provides as follows:

"Whenever the regional director deems it advisable to seek temporary injunctive relief under section 10(j), or whenever he determines that complaint should issue alleging violation of section (8) (b) (4) (A), (B), or (C) [29 U.S.C.A. § 158(b) (4) (A–C)], or whenever he deems it appropriate to seek temporary injunctive relief for a violation of section 8(b) (4) (D), the officer or regional attorney to whom the matter has been referred will make application for appropriate temporary relief or restraining order in the District Court of the United States within which the unfair labor practice is alleged to have occurred or within which the party sought to be enjoined resides or transacts business."

It is urged by the respondents that, by the adoption of this rule, the Board has attempted to delegate a power which cannot be lawfully delegated and that the Board must exercise its own discretion in applying for injunctive relief under Section 10(j).

The section of the Act under consideration refers to the "Board." This means, according to Section 3(a) of the Act, 29 U.S.C.A. § 153(a), the "National Labor Relations Board," consisting of five members who are appointed by the President, by and with the advice and consent of the Senate. It is urged on behalf of the petitioner that, although this Board is referred to in terms in Section 10(j), nevertheless the Congress meant to vest the General Counsel with the authority to initiate proceedings under that section. In support of this view, it is argued that the National Labor Management Act, 1947, separated the adjudicatory functions of the Board from its prosecutive and investigative functions; that the latter functions were given to the General Counsel, who has supervision over the officers and employees of the regional offices by virtue of Section 3(d) of the Act; and that the whole scheme of the statute for the separation of functions requires a construction of Section 10(j) which permits the General Counsel, rather than the Board,

to invoke the procedure laid down by that section.

The statute is not capable of being thus interpreted. It is true that before an application for temporary relief can be made pursuant to Section 10(j), there must be an issuance of a complaint as provided for in Section 10(b) of the Act, and that, while the latter section gives the "Board, or any agent or agency designated by the Board for such purposes" the power to issue the complaint, it is the General Counsel's function to issue such complaint. This is because Section 3(d) provides that the General Counsel "shall have final authority, on behalf of the Board, in respect of the investigation ·of charges and issuance of complaints under Section 10." There is no such provision for authority to petition a district court for temporary relief.

It is also true that there are other sections of the Act which refer to the "Board" in terms, although the duties which are there involved may properly be performed by someone other than the Board members themselves. In Section 9(c), 29 U.S.C.A. § 159(c), it is provided that the "Board" shall investigate representation petitions, and Section 9(f) provides that "No investigation shall be made by the Board" in reference to representation of employees in certain instances. But, as in the case of Section 10(b), these sections are modified by another portion of the Act. Section 5, 29 U.S.C.A. § 155, provides in part, "The Board may * * * by such agents or agencies as it may designate, prosecute any inquiry necessary to its functions * * *."

No such modification of the provisions of Section 10(j) are to be found in the Act.

 A familiar principle governing the interpretation of statutes is that if a statutory definition of a word is given, that definition must prevail, regardless of what other meaning may be attributable to the word. Von Weise v. Commissioner, 8 Cir., 1934, 69 F.2d 439; Schweizer v. Mager, D.C.N.D.Ill.1924, 297 F. 334. See Western Union v. Lenroot, 1945, 323 U.S. 490, 502, 65 S.Ct. 335, 89 L.Ed. 414; Fox v. Standard Oil Co., 1935, 294 U.S. 87, 95,

55 S.Ct. 333, 79 L.Ed. 780. Thus, the definition of "The Board" which is provided by Congress in Section 3(a) of the Act precludes the court from inquiring beyond the prescribed meaning of the language used. But, assuming that such inquiry were justified, the legislative history of the Act lends no support to the contention of the petitioner that Congress meant the General Counsel, or someone under his supervision, when it provided that the "Board" should make application for temporary relief under Section 10(j).

▇▇ The conclusion of the Court is that when the Congress used the word "Board" it meant the National Labor Relations Board, as contemplated in Section 3(a) of the Act. And obviously, this was the understanding of the National Labor Relations Board itself when it purported to delegate the powers vested by Section 10(j), for otherwise its delegation of such authority would be presumptious. Its prior actions in this regard speak more forcibly than the petitioner's later arguments.

▇▇ Having come to the foregoing conclusions, the problem before the Court is narrowed to the validity of the Board's delegation of its power to make applications for temporary relief under the provisions of Section 10(j).

Before reaching that question, it should be pointed out that the Board has acted not once, but twice, with reference to a sub-delegation of its functions under Section 10(j). In the first place, it has adopted the aforementioned Rule 202.35, which directs the regional director to make application to the district court for appropriate interlocutory relief whenever he "deems it advisable." Secondly, during argument by counsel for the petitioner it was disclosed that the members of the Board and the General Counsel have entered into a "memorandum of understanding" which in pertinent part states: "General Counsel shall exercise full and final authority and responsibility on behalf of the Board for initiating and prosecuting injunction pro-

ceedings as provided for in Sections 10(j) and 10(1)." It would seem that as a result of these actions by the Board there co-exist two delegations of the same function; one by a rule adopted in accordance with Section 6 of the Act, which gives the Board the authority to make rules and regulations "as may be necessary to carry out the provisions" of the Act, and the other contained in an unpublished intra-agency agreement between the General Counsel and the Board. Leaving aside any question of validity, these delegations appear to be inconsistent and conflicting. But closer analysis leads to a contrary conclusion.

Section 4(a) of the Act gives the Board the authority to appoint regional directors. However, Section 3(d) provides that the General Counsel shall exercise supervision over all personnel in the regional offices.[1] So that a regional director, although an appointee of the Board, is under the supervision and is a subordinate of the General Counsel. As a consequence, such a delegation of authority by the Board to the regional directors as is embodied in Rule 202.35, is, in effect, nothing less than a delegation of authority to the General Counsel.

▇▇ The question then remains as to what express or implied authority the Board has for delegating to the General Counsel the powers conferred by Section 10(j).

Besides giving the General Counsel supervision over the regional officers and employees, Section 3(d) provides that "He shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under Section 10, and in respect of the prosecution of such complaints before the Board, and shall have such other duties as the Board may prescribe or as may be provided by law."

The provision that the General Counsel shall have "such other duties as the Board

---

[1] The purpose and extent of this supervision is indicated by the report of the Congressional Committee of Conference, House Report No. 510, June 3, 1947, page 37:

"By this provision responsibility for what takes place in the Board's regional offices is centralized in one individual, who is ultimately responsible to the President and Congress."

may prescribe" must mean necessarily that the Board may confer upon the General Counsel functions other than those specifically committed to him by statute; otherwise, it would be "superfluous and without meaning or purpose." Cudahy Packing Co. v. Holland, 1942, 315 U.S. 357, 364, 62 S.Ct. 651, 655, 86 L.Ed. 895. Respondents argue that this clause in Section 3(d) has been incorporated in the Act merely "to enable the General Counsel to perform such administrative and technical functions as are customarily associated with the office of the General Counsel." However, there is nothing in the legislative history of the act indicating that this clause may not be authority for a delegation of powers of a much broader scope than that suggested by the respondents. Further, the clause is preceded by an express provision that the General Counsel shall have final authority, on behalf of the Board, in respect of the issuance of complaints under Section 10— a function which Section 10(b) gives to the Board or its agent. It is not unreasonable to assume that Congress intended that the Board might delegate to the General Counsel duties equal in importance with those expressly enumerated.

Respondents also contend that the statutory scheme for a separation of powers within the administrative agency supports their view that the "other duties" clause of Section 3(d) cannot be interpreted to include functions which are specifically delegated to the Board. But since these "other duties" which the Board may prescribe for the General Counsel are obviously not duties which relate to functions he already has under the statute, they necessarily are functions which are expressly or impliedly lodged with the Board.

▮▮▮ Further, it is contended by respondents that if the Board's power to petition for interlocutory equitable relief under the provisions of Section 10(j) is delegable, there is no limit to the authority to confer its functions upon the General Counsel and that such delegation could extend even to the distinctly judicial powers of the Board. The statute itself, as well as its legislative background, indicates that it was the purpose and policy of Congress to separate the judicial functions of the Board from any prosecutive or investigative functions. Thus, it is not reasonable that the Board could properly delegate its functions of a judicial nature, because such a delegation would pervert the Congressional design for the separation of powers within the agency. On the other hand, the delegation of its functions which are of a more prosecutive than judicial nature is in harmony with this design.

The consistency of such a delegation with the Congressional intent to sever the judicial functions of the agency from its prosecutive activities is emphasized when the authority to initiate interlocutory proceedings for temporary relief under Section 10(j) is more carefully considered. If the Board itself were to petition the court for such temporary relief, not only would it be performing a function of a prosecutive nature, but also it would have considered, ex parte, facts which relate to the very issues upon which the Board must ultimately pass in its quasi-judicial capacity. It is reasonable to assume that such prosecutive action and prejudgment on the part of the Board might tend to cast the shadow of partiality upon the further and principal proceedings before the Board.

For the foregoing reasons the respondents' motion to dismiss the petition and to set aside the rule to show cause is denied. The Clerk of the Court is directed to enter an order denying the motion and to notify counsel that the hearing on the rule will be at 10:00 A.M., March 3, 1948.

### Findings of Fact and Conclusions of Law.

This cause came on to be heard upon the verified petition of Jack G. Evans, Regional Director of the Ninth Region of the National Labor Relations Board, on behalf of said Board, for a temporary injunction, pending final adjudication of the Board of the matters involved, and upon issuance of a rule to show cause why an injunction as prayed should not be issued. Respondents' motion to dismiss the petition and discharge the rule on the ground that section 10(j) of the National Labor Relations Act, as amended June 23, 1947, 29 U.S.C.A. § 141 et seq., Supp.July 1947, herein called the Act, under which this proceeding was in-

stituted, is unconstitutional and that the proceeding was not properly initiated was heard on February 10, 1948, and denied on February 25, 1948. Hearings on the rule to show cause were held from March 3 to 14, 1948. All parties were afforded full opportunity to be heard, examine and cross-examine witnesses, present evidence bearing on the issues and to argue on the evidence and the law. Thereafter the parties were granted time within which to file briefs and proposed findings of fact and conclusions of law. The amici curiæ were granted time in which to file briefs and to submit comments upon the proposed findings of fact and conclusions of law. The Court has fully considered the petition, answer, testimony, evidence, briefs and arguments of counsel. Upon the entire record the Court makes the following:

### Findings of Fact.

1. Petitioner is Regional Director of the Ninth Region of the National Labor Relations Board (herein called the Board).

2. Respondent International Typographical Union (herein called ITU), an unincorporated association, is a labor organization having its principal office within this judicial district and is engaged and at all times material herein has been engaged in promoting and protecting the interests of its members and of members of its subordinate local unions within this judicial district and elsewhere in the United States.

3. Respondents Randolph, Taylor, Brown and Hurd are, respectively, president, first vice-president, second vice-president, and secretary-treasurer of respondent ITU. These four persons constitute the Executive Council of respondent ITU. Each of them is and at all times material herein has been engaged in this judicial district and elsewhere throughout the United States in promoting and protecting the interests of members of respondent ITU and its subordinate local unions.

4. The respondents transact business in connection with the activities described in Findings 2 and 3 within this judicial district.

5. On or about November 17, 1947, American Newspaper Publishers Association (herein called the Association), pursuant to the provisions of the Act, filed a charge with the Board alleging that respondents have engaged in and are engaging in unfair labor practices within the meaning of Section 8(b), subsections (1) (A), 1(B), (2), and (6) of the Act.

6. On November 21, 1947, the General Counsel of the Board, on behalf of the Board, by petitioner, issued a complaint charging respondents with engaging in violations of Section 8(b), subsection (1) (A), (1) (B), (2) and (6) of the Act, and affecting commerce within the meaning of Section 2, subsections (6) and (7) of the Act, as charged.

7. The evidence indicates a probability of the existence of the following facts:

(a) The Association, a New York corporation with its principal office in New York City, has a membership of over 800 newspaper publishers, whose publications carry over 90 per cent of the advertising published in daily and Sunday newspapers throughout the United States and whose daily and Sunday circulation exceeds 90 per cent of the total such circulation in the United States.

(b) A substantial number of newspaper publishers throughout the United States use equipment, materials and supplies in the production and publication of their respective newspapers, transported in interstate commerce. During the year of 1947 these materials included approximately 4,500,000 tons of newsprint paper, of which over 3,000,000 tons came from Canada, over 100,000 tons from Newfoundland, and about 100,000 from Europe; and ink, type metal, and other supplies valued in the millions of dollars.

(c) A substantial number of the newspapers utilize national and international news services, including Associated Press, United Press, International News Service, and a large number of other agencies which supply feature material of various kinds. The furnishing of these services requires the use of various channels of interstate commerce and communication.

(d) Approximately 51,000,000 copies of newspapers are circulated daily in the United States, a substantial amount of which is circulated through the channels of inter-

state commerce. Approximately 12 percent of the circulation is through the United States mail.

(e) The respondent International Typographical Union was organized in 1852 under the name of National Typographical Union as an amalgamation of previously existing local typographical societies, some of which had existed since 1805. The respondent ITU was the parent organization from which, without objection from it, the pressmen organized their own labor organization in 1892, the bookbinders in 1896, the stereotypers in 1903 and the photoengravers in 1906. It now claims jurisdiction over composing room employees and mailing room employees.

The Constitution, Bylaws, and General Laws of respondent ITU, provide for the exercise of complete control by respondent ITU and the members of its Executive Council over the subordinate local unions and members of respondent ITU, except in respect to purely local matters not in conflict with the laws of respondent ITU. This control includes supervision of the contractual relations between subordinate local unions and employers and sanctioning of strikes.

Section 2 of Article X of the constitution of respondent ITU provides: "Any subordinate union which shall fail to make reports required by law or the Executive Council, or which shall neglect or refuse to obey any law or legal mandate of the International Typographical Union or Executive Council, may be fined or have its charter suspended by the Executive Council."

Section 7 of Article XIX of the Bylaws of said respondent provides: "It is imperatively ordered that no strike or lockout shall be deemed legal, or money expended from the defense fund on that account, unless the strike or lockout shall have been authorized or recognized by the Executive Council; * * *"

Section 42 of Article IV of the Bylaws of said respondent provides: "Any subordinate union, member, or members refusing to accept and observe a decision or action of the Executive Council pending appeal to a convention, or any subordinate union, member or members refusing to accept and observe decision of a convention upon a matter that has been appealed shall be subject to summary expulsion by the Executive Council."

(f) The composing and mailing room employees of approximately ninety-four percent of the members of the American Newspaper Publishers Association as of and since August 22, 1947, are represented for purposes of collective bargaining by subordinate local unions of the International Typographical Union.

(g) Prior to August 22, 1947, relations between subordinate local unions of respondent ITU and newspaper publishers were customarily fixed by written contracts containing closed-shop provisions. Approximately 450 such contracts were entered into annually by subordinate unions of respondent ITU and members of the Association for a fixed duration period of one year or more.

(h) Beginning about July 1, 1947, respondent Randolph and the other individual respondents composing the Executive Council of respondent ITU instigated, advised, and urged the respondent ITU and its members to adopt a policy of refraining from customary contractual relations with employers and of preventing subordinate local unions from entering into any collective bargaining agreements with employers. The primary purpose of this policy was to preserve the closed shop for the ITU and to circumvent the statutory elimination of the closed shop.

(i) On August 21, 1947, respondent ITU, in annual convention adopted a policy to refrain from entering into contracts with employers and empowered respondents Randolph, Taylor, Brown and Hurd, constituting its Executive Council, to construe, interpret and enforce this policy. This policy has been identified as a "no contract" policy. This policy is epitomized by the following quotation from the General Laws, Article III, Section 1, adopted by the 1947 Convention of the ITU: "It will be our policy to refrain from signing contracts in order that we avoid agreeing, or seeming to agree, or voluntarily accepting the conditions created by such a relationship under the Labor Management Re-

892

lations Act of 1947. \* \* \* Upon the expiration of existing contracts, and until the laws above referred to are amended and free collective bargaining is again recognized, our members may accept employment only from employers who are willing to employ them under the 'Conditions of Employment' which the several unions adopt, after approval by the Executive Council of the ITU."

(j) At the same time, respondent ITU empowered the Executive Council to expel subordinate local unions or members who refused to observe the decisions or actions of the Executive Council and prohibited subordinate local unions from entering into contracts contrary to the above policy and not approved by the ITU president, respondent Randolph.

(k) In declared compliance with the part of its "no-contract" policy providing that the Executive Council is authorized to interpret, construe, and enforce that policy, the respondent ITU on or about October 6, 1947, through its Executive Council, instructed and advised its members and the subordinate local unions that a form of contract known as "P–6(a)" might be proposed to employers in lieu of "Conditions of Employment," but that none of the terms of the P–6(a) form should be changed "in any way." The provisions of this form, including its 60-day termination clause, and the statements and conduct of the respondents relating to it, indicate that its purpose was to give a semblance of good faith collective bargaining on behalf of the subordinate local unions who proposed this form to employers, while at the same time imposing closed-shop conditions upon those employers who signed such forms, or alternatively requiring employers to submit to "Conditions of Employment" unilaterally imposed by the subordinate local unions in line with the "no-contract" policy of the ITU, which "Conditions of Employment" unequivocally required the employer to maintain a closed shop.

(1) Since August 22, 1947, the Executive Council has construed, interpreted and enforced this policy by ordering, instructing, directing and requiring the approximately 850 subordinate local unions of respondent ITU, alternately, to refrain from entering into any contract or to refuse to enter into any contract not terminable upon 60 days' notice, contrary to the custom and practice theretofore prevailing in the industry, and which did not contain substantially the provisions of the Form P–6(a). For example, the respondents advised its members and local unions as follows: "Follow ITU collective bargaining policy no matter what happens." Previously it had advised: "That policy can be successful only so long as local unions and employers fail to reach an agreement by the process of collective bargaining." In one instance it mandated a subordinate local union to follow the "no-contract" policy of the respondent ITU.

(m) Since August 22, 1947, each subordinate local union whose contract status has indicated the necessity for contract negotiations, with few exceptions, has adhered to the "no-contract" policy adopted by the ITU as construed, interpreted, and enforced by the Executive Council.

(n) Since August 22, 1947, pursuant to the orders, mandates, instructions and directions of the Executive Council, subordinate local unions have refused to enter into contracts of customary duration, have unilaterally imposed or sought to impose "Conditions of Employment" on employers, or have insisted that employers enter into Form P–6(a) agreements or variations thereof, terminable upon 60 days' notice and generally containing clauses which either caused or attempted to cause, and either cause or attempt to cause, employers to maintain closed-shop conditions and to discriminate against non-members of respondent ITU in regard to hire, tenure, or conditions of employment.

(o) The principal object of the "no-contract" policy as adopted by respondent ITU, and construed, interpreted and enforced by the Executive Council, and adhered to and executed by the subordinate local unions referred to in Finding 7(m) was and is to cause or attempt to cause employers to discriminate against non-members of respondent ITU in regard to hire, tenure, or conditions of employment.

(p) Respondent ITU in adopting its "no-contract" policy, and the Executive Council

in construing, interpreting and enforcing the "no-contract" policy:

(1) Have caused or attempted to cause, and are causing or attempting to cause, employers to discriminate against non-members of respondent ITU in regard to hire, tenure, or conditions of employment.

(2) Have restrained and coerced, and are restraining and coercing, employees in the exercise of the right to bargain collectively through representatives of their choosing by causing subordinate local unions to fail and refuse to bargain collectively in good faith in their behalf with employers.

(q) Since August 22, 1947, the respondent International Typographical Union's "no-contract" policy has been a contributing, if not the sole factor causing subordinate local unions and members of the ITU to engage in strikes and slow-downs against employers in various cities, including Chicago, Illinois; Hammond, Indiana; Jamestown, New York; Rockville Center, Long Island, New York; and Columbus, Georgia, which strikes respondents have authorized, recognized, sanctioned and supported. Respondents also have taken steps or have been requested by subordinate local unions to take steps toward authorization, recognition, sanction and support of strike action against newspapers in Detroit, Michigan, and Cincinnati, Ohio.

(r) The acts and conduct of respondents above set forth, occurring in connection with the operations of the newspaper publishers described above, have a close, intimate and substantial relation to trade, traffic and commerce among the several States and tend to lead and have led to labor disputes burdening and obstructing commerce and the free flow of commerce.

(8) Generally, the strikes have deprived the public of complete and current news. In some instances newspapers have been compelled to suspend publication for short periods of time. In most instances, the struck newspapers are being published by a substitute process. The supply of such available substitute facilities is limited so that any substantial addition to the number of strikes now in existence may make it impossible for struck newspapers in some communities to publish at all.

(9) On February 18, 1948, the members of the ITU voted to increase the assessment of their wages for the benefit of the fund with which the respondent ITU supports strikes from one-half percent to five percent for a period of one year, unless sooner reduced by the Executive Council, thereby increasing the average monthly revenue of said fund from approximately $100,000 to approximately $1,000,000.

(10) Respondents have indicated no intention to discontinue their "no-contract" policy or their insistence upon the maintenance by employers of closed-shop conditions for the benefit of the members of the respondent ITU in the newspaper industry. On the contrary, respondents have indicated every intention of continuing their conduct unless restrained.

(11) It is reasonable to anticipate from the past conduct of respondents and from statements and declarations of their intentions, that if respondents are permitted to persist in the enforcement of the ITU "no-contract" policy and in their insistence upon the maintenance of closed-shop conditions for the benefit of the members of the respondent ITU in the newspaper industry, such conduct will result (1) in further strikes, slow-downs and other disruptions of operations in the newspaper industry, to the detriment and injury of the printers' employment, the publishers' operations and the general public interest; (2) in the destruction of collective bargaining and stable labor relations between the respondent ITU or its subordinate local unions and the newspaper publishing industry, which an order of the Board may not be able to restore or repair; (3) in employees and the public generally suffering irreparable injury by denial of the benefits and stability derived from genuine collective bargaining; and (4) in employers either (a) being compelled to violate Section 8(a) (3) of the Act, thereby subjecting themselves to a multiplicity of suits and penalties under the Act, or (b) being subjected to the threat of serious and irreparable injury from strikes, slow-downs and other disruptions of their operations.

894

## Conclusions of Law

1. A substantial number of the newspaper publishers referred to in Finding 7(a) and against whom respondents' acts and conduct have been and are directed are engaged in commerce within the meaning of Section 2, Subsections (6) and (7) of the Act.

2. Respondent International Typographical Union is a labor organization within the meaning of Section 2, Subsection (5) of the Act.

3. Respondents Randolph, Taylor, Brown and Hurd are agents of respondent ITU within the meaning of Section 8(b) of the Act.

4. This Court has jurisdiction of the proceedings and of respondents and to grant temporary equitable relief under Section 10(j) of the Act.

5. There is a probability that respondents, and each of them, have engaged in unfair labor practices within the meaning of Section 8(b), Subsections (1) (A) and (2) of the Act, and affecting commerce within the meaning of Section 2, Subsections (6) and (7) of the Act.

6. To preserve the issues presented for their orderly determination by the Board as provided in the Act, and to avoid irreparable injury to the interests of the public, employees and employers, it is appropriate, just, and proper that, pending final adjudication by the Board of the said issues, respondents, their agents, servants, employees, attorneys, and all persons acting in active concert or participation with them be enjoined and restrained from the commission or continuation of the acts and conduct set forth in Finding (p) above, acts in furtherance or support thereof, and like or related acts or conduct whose commission in the future is likely or fairly may be anticipated from respondents' acts and conduct in the past.

## Decree.

This cause came on to be heard upon the verified petition of Jack G. Evans, Regional Director of the Ninth Region of the National Labor Relations Board, on behalf of said Board, for a temporary injunction pending final adjudication of the Board of the matters involved, and a rule to show cause why injunctive relief as prayed should not be granted. The Court, upon a consideration of the petition, motions, answers, all other papers, testimony, evidence, oral arguments and briefs, duly made and entered its findings of fact and conclusions of law.

It is, therefore, by this Court ordered, adjudged and decreed as follows:

1. That respondents International Typographical Union, Woodruff Randolph, Larry Taylor, Elmer Brown, and Don Hurd, and each of them, and their agents, servants, employees, attorneys and all persons in active concert or participation with them, be and they hereby are restrained and enjoined, pending the final adjudication of this matter in Case No. 9–CB–5. by the National Labor Relations Board, from:

A. In any manner promulgating, disseminating, pursuing, observing, or in any wise giving effect to, or ordering, instructing, requiring, recommending, inducing, encouraging or in any wise causing subordinate local unions and members of respondent International Typographical Union, or any of them, to promulgate, disseminate, pursue, observe, or in any wise give effect to, any policy, practice or course of conduct which in any manner requires, induces, or in any wise causes, respondent International Typographical Union or its subordinate local unions, or any of them (a) to refuse to bargain or refrain from bargaining collectively in good faith with employers with respect to wages, hours and other terms and conditions of employment or the negotiation of an agreement, or any question arising thereunder, (b) to refuse to execute or refrain from executing, upon request a written contract incorporating any agreement reached, and (c) to refuse to bargain or refrain from bargaining collectively in good faith with employers for collective bargaining contracts for a definite term in accordance with the practice and custom established by respondent International Typographical Union and its subordinate local unions in their bargaining with representatives of the newspaper industry over the course of years.

B. In any manner promulgating, disseminating, pursuing, observing, or in any wise giving effect to or ordering, instructing, requiring, recommending, inducing, encouraging, or in any wise causing subordinate local unions and members of respondent International Typographical Union, or any of them, to promulgate, disseminate, pursue, observe, or in any wise give effect to, any policy, practice, or course of conduct, including without limitation (a) conditions of employment, (b) Form P–6(a) contracts or modifications thereof, (c) provisions for cancellation of an entire agreement upon 60 days' notice, (d) laws, rules and decisions of respondent International Typographical Union, which in any manner discriminates against employees in regard to hire or tenure of employment, or any term or condition of employment, because of non-membership in respondent International Typographical Union or its subordinate local unions, or any of them, or causes or attempts to cause employers in the newspaper industry to so discriminate against employees, except in accordance with the provisos to Section 8(a) (3) of the National Labor Relations Act, as amended.

C. In any manner continuing in effect, or permitting to continue in effect, any of the acts and conduct restrained and enjoined in subparagraphs A and B, above.

D. In any manner, supporting, authorizing sanctioning, recognizing, instigating, inducing, or encouraging subordinate local unions and members of respondent International Typographical Union, or any of them, to engage in, or to continue to engage in, any strikes, slow-downs, walkouts, or other disruptions of any kind to the business operations of employers in the newspaper publishing industry which are in furtherance of, attributable to, arising out of, or caused solely or in part by, the acts and conduct hereinabove restrained and enjoined in subparagraphs A, B and C above.

2. This decree shall not prevent the respondents, or any of them, from advising the members and subordinate local unions of the International Typographical Union that contracts entered into between the said local unions and employers during the existence of this injunctive order may contain provisions that in the event the National Labor Relations Board in its final order in Case 9–CB–5 dismisses the charges against the respondents, such contracts may be terminated thereafter upon 60 days' written notice to either party.

3. Jurisdiction of this cause is retained for the purpose of giving full effect to this decree, and for the purpose of making such further and other orders and decrees in modification of this decree as may be deemed necessary upon further and sufficient showing.

4. This decree shall remain in force and effect from the date of its entry until further order of this court, but not longer than the final order in Case No. 9–CB–5, now pending before the National Labor Relations Board.

5. The Clerk of the Court is hereby ordered to cause copies of this decree to be served forthwith on all respondents.