## UNITED STATES v. AMERICAN LOCOMOTIVE CO., Inc. et al.

### Civ. No. 5524.

United States District Court
W. D. New York.
Dec. 29, 1952.
Writ of Certiorari Denied Jan. 5, 1953.
See 73 S.Ct. 337.

James P. McGranery, Atty. Gen. of United States, George L. Grobe, U. S. Atty., Buffalo, N. Y., Holmes Baldridge, Asst. Atty. Gen., Edward H. Hickey, Sp. Asst. to Atty. Gen., John G. Roberts, Attorney, Department of Justice, Herman Marcuse, Attorney, Department of Justice, Washington, D. C., and Henry W. Killeen, Jr., Asst. U. S. Atty., Buffalo, N. Y., of counsel, for plaintiff.

Peter J. Crotty, Buffalo, N. Y., Arthur J. Goldberg, General Counsel for CIO and General Counsel for United Steel Workers of America, CIO, and David E. Feller, Assistant General Counsel for CIO, Washington, D. C., of counsel, for defendant Union.

Hodgson, Russ, Andrews, Woods & Goodyear, Homer H. Woods, Buffalo, N. Y., W. J. Bolte, New York City, John E. Dickinson, Buffalo, N. Y., of counsel, for American Locomotive Co.

KNIGHT, Chief Judge.

There comes up for consideration by this Court a motion, by the plaintiff, for a preliminary injunction enjoining "the defendants, and each of them, and their officers, agents, servants and employees, and all persons in active concert or participation with them, or any of them, (a) from in any manner continuing, encouraging, ordering, aiding, engaging or taking any part in strikes or lockouts in the plant of the American Locomotive Co. (hereinafter called ALCO) at Dunkirk, New York; (b) from in any manner interfering with or affecting the orderly continuation of work in the said plant, and from taking any action which would interfere with this Court's jurisdiction in the premises."

On December 12, 1952, this Court, on application of the plaintiff, granted a temporary restraining order enjoining defendants and individuals from doing or engaging in any of the aforesaid acts. The temporary restraining order provided for its expiration at 2:35 o'clock P.M. on December 22, 1952, lest before that time the said order, for good cause shown, is extended or lest the defendants consent that it may be extended for a longer period. It is in pursuance of the provisions of the temporary restraining order that this application on the 18th day of December, 1952, was made for a preliminary injunction.

There is also here under consideration a motion made by the defendants for an or-

der to dissolve the restraining order herein on the ground that it appears on the face of the complaint that it does not state facts sufficient to constitute a cause of action, in that said complaint does not comply with the provisions of Sec. 208 of the Labor Management Relations Act, 1947. Also, for the further reason that this Court has no jurisdiction over the subject matter and for such other and further relief as may be proper.

Several voluminous affidavits have been submitted on behalf of the plaintiff and defendants. It has been stipulated that certain individuals making such affidavits, if called as witnesses, would testify as stated in their respective affidavits and it is further stipulated that, subject to the approval of the Court, the issues presented by the application of the United States for a preliminary injunction, together with the motions, filed by the United Steel Workers of America, CIO, to dissolve the temporary retraining order and to dismiss the complaint may be determined upon the within stipulated evidence, the oral argument of counsel and written memoranda or briefs submitted or to be submitted by counsel for the parties.

The application of the Government for a temporary injunction is made under the provisions of Sec. 208 of the Labor Management Relations Act of 1947 (The Taft-Hartley Act), 61 Stat. 155, 29 U.S.C.A. § 178.

The relevant parts of Sec. 208 are as follows:

"Section 208 (29 U.S.C. (Supp. V) 178). Strikes subject to injunction; in applicability of sections 101–115 of this title; review

"(a) Upon receiving a report from a board of inquiry the President may direct the Attorney General to petition any district court of the United States having jurisdiction of the parties to enjoin such strike or lock-out or the continuing thereof, and if the court finds that such threatened or actual strike or lock-out—

"(i) affects an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce; and

"(ii) if permitted to occur or to continue, will imperil the national health or safety, it shall have jurisdiction to enjoin any such strike or lock-out, or the continuing thereof, and to make such other orders as may be appropriate.

"(b) In any case, the provisions of sections 101–115 of this title, shall not be applicable.

"(c) The order or orders of the court shall be subject to review by the appropriate United States court of appeals and by the Supreme Court upon writ of certiorari or certification as provided in section 1254 of Title 28."

The Dunkirk plant has approximately 1500 employees of whom 950 were working on products for the Atomic Energy Program at the time of a strike of the United Steel Workers of America, CIO. About fifty percent of the plant's output consisted of products for the Atomic Energy Program. The contract between ALCO and the Union covering this plant expired on January 31, 1951. Thereafter negotiations were engaged in to reach an agreement on the terms of a new contract, which continued to the time of the granting of the order on December 12th.

The work stoppage concerned, among other things, wages, paid vacations and the union shop. While the defendant ALCO has other plants than that at Dunkirk, we are concerned only with the work stoppage at that plant. ALCO was under contract with the Atomic Energy Commission, and certain of its prime contractors, to furnish certain specialized materials, including among others processed piping, heat exchanger shells and heat exchangers and gas converter sub-assemblies, vitally needed for the completion of the constructions of major facilities for the production of fissionable materials. It is apparent that these facilities constitute a substantial part of the Atomic Energy industry and that de-

lay in the construction of these materials, caused by the Dunkirk strike, will mean a loss in the production of atomic weapons. Large dimension pipes are needed in the construction of three plants which, when completed, will produce uranium–235. As a result of the strike, work has been stopped on twenty-four heat exchanger shells to be used in the Savannah work program of the Commission. These shells are needed in the production of heavy water, which in turn is required for the operation of nuclear reactors capable of producing fissionable materials. The strike has also stopped the production of gas converter assemblies which are needed for installation at the Commission's plants for the production of fissionable materials and any attempt to obtain these sub-assemblies from other sources would cause substantial delay.

It is made to appear from the affidavits that the present facilities for the production of fissionable materials are inadequate to meet atomic weapon wants which the President, on recommendations of the Joint Chiefs of Staff and the National Security Council, has determined to be required for national defense. It becomes imperative to construct the plants, the construction of which is delayed by the strike. It also appears from the affidavits that the estimated cost of the plants affected by the strike exceed $1,800,000,000 and that the total cost of all the existing facilities of a comparable kind is $1,450,000,000.

At the expiration of the contract between the Company and the Union in 1951, negotiations were entered into for a new contract. These were unsuccessful and a strike was threatened. On December 29, 1951, the President of the United States, by virtue of Executive Order 10233, 50 U.S.C.A.Appendix, § 2071 note, certified the dispute to the Wage Stabilization Board. This latter Board set up a panel to hear the dispute but the Company objected to this dispute at Dunkirk being processed as part of a principal steel and ore case. The Company and the Union agreed to defer presentation to the Wage Stabilization Board until after the steel case was disposed of, when the parties asked the Wage Stabilization Board to proceed with the

Dunkirk case. Hearings were had and testimony taken but the amendment of June, 1952, to the Defense Production Act, 50 U.S.C.A.Appendix, § 2071 et seq., took away the jurisdiction of the Wage Stabilization Board to make recommendations in a dispute case. Negotiations, however, continued between the two parties, and the Company offered 12½ cents per hour increase in pay. This was rejected by the Union and this strike began August 29, 1952.

Before the institution of this action the President of the United States, on December 3, 1952, acting under the provisions of Sec. 206 of the Act, 29 U.S.C.A. § 176, issued Executive Order 10417, 17 F.R., 10981, creating a Board of Inquiry to inquire into the issues involved in the dispute and to submit its report to the President, all in accordance with the provisions of Sec. 206, Labor Management Relations Act, 1947, 61 Stat. 155.

Section 206 provides:

"Sec. 206 (29 U.S.C. (Supp. V) 176). National emergencies; appointment of board of inquiry by President; report; contents; filing with Service

"Whenever in the opinion of the President of the United States, a threatened or actual strike or lockout affecting an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce, will, if permitted to occur or to continue, imperil the national health or safety, he may appoint a board of inquiry to inquire into the issues involved in the dispute and to make a written report to him within such time as he shall prescribe. Such report shall include a statement of the facts with respect to the dispute, including each party's statement of its position but shall not contain any recommendations. The President shall file a copy of such report with the Service and shall make its contents available to the public."

Thereafter, on December 11, 1952, the President directed a communication to the Attorney General of the United States in which he in part said, "In my opinion this unresolved labor dispute has resulted in a strike affecting an entire industry, or a substantial part thereof engaged in trade and commerce among the several States and with foreign nations and in the production of goods for commerce, which strike, if permitted to continue, will imperil the national safety". He directed the Attorney General to petition any District Court of the United States, having jurisdiction of the parties, to enjoin the continuation of such strike. Thereafter, on December 12, 1952, pursuant to the direction, the Attorney General, appearing by the Assistant Attorney General, the United States Attorney for the Western District of New York, the Special Assistant to the Attorney General, and two attorneys of the Atomic Energy Commission, petitioned this Court to enjoin the strike, or the continuing thereof, on the ground that it affects an entire industry, or a substantial part thereof, and, if permitted to continue, will imperil the national safety.

The Board of Inquiry report, the finding of the President of the United States and the affidavits submitted herein, definitely and clearly show that, "The strike affects interstate commerce, and, if permitted to continue, will imperil national safety". It further appears that the procedure provided by the Taft-Hartley Act, has been strictly. followed.

Our first concern is with the question of the constitutionality of the Taft-Hartley Act. It is the contention of the defendant Union that the injunctive provisions of the Taft-Hartley Act are unconstitutional because they confer on the court duties which are not judicial and are not connected with any case or controversy.

The basic problem transcends the ordinary employer-employee dispute wherein private, personal and individual rights are solely involved. The United States of America, plaintiff herein, represents some 140,000,000 Americans whose welfare under the self-same Constitution cannot be ignored.

While technically not at war, existing conditions in Korea are tantamount to war. The Board of Inquiry correctly found that the labor dispute in this plant is immediately and seriously delaying the production of equipment and of fissionable material essential to the making of atomic weapons for the national defense. The strike affects an entire industry or substantial part thereof.

Abuses grew out of the effort to control labor strife during World War II through seizure and by the use of the machinery of the War Labor Disputes Act of 1943 because sufficient safeguards were not thrown around the procedure. But the Taft-Hartley Act definitely has attempted to avoid these abuses through the Board of Inquiry; the action of the President and the Attorney General followed by a court hearing; opportunity for adjustment efforts after an injunction has been granted; reconvening of the Board of Inquiry; report to the President and a secret ballot of each employee. Seemingly a complete safeguard is thrown around the rights of the parties.

The Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C.A. § 101 et seq., specifically withdrew jurisdiction of the courts in labor disputes. The courts had such jurisdiction prior to that enactment. It is to be borne in mind that strikes subject to injunction are limited to those which imperil the national health and safety.

It is the Union's contention that the proceedings under the Taft-Hartley Act are not "judicial" and do not come within the authority of Article III, Secs. 1 and 2, of the United States Constitution.

While in some eight different cases the Act has been under consideration, so far as I am advised, U. S. v. International L. & W. Union, D.C., 78 Supp. 710, and United States v. International Union, D.C., 89 Supp. 187, are the only ones in which the Court has passed directly on the constitutionality of the Act. In both of these cases it was definitely held that the Act was constitutional. See also Interstate Commerce Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047; Postum Cereal Co. v. California Fig Nut Co., 272 U.S. 693, 47 S.Ct. 284, 71 L.Ed. 478; Hecht Co. v.

Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754; U. S. v. International Union, D.C., 77 F.Supp. 563, affirmed 85 U.S.App. D.C. 149, 177 F.2d 29, certiorari denied 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535; Douds v. Local 1250, R.W.D.S. Union, 2 Cir., 170 F.2d 695; Evans v. International Typographical Union, D.C., 76 F.Supp. 881; United States v. Carbide & Carbon Chemicals Corp., D.C.E.D.Tenn., N.Div.Civil No. 1093, 1948.[1]

In the well known Debs case (In re Debs), 158 U.S. 564, 584, 15 S.Ct. 900, 906, 39 L.Ed. 1092, in which it appears no such statute as the Taft-Hartley Act existed, an injunction was granted the United States against the strike of the Pullman Company. The similarity of the questions involved in both that and the instant case is readily noted and the language of that opinion is strikingly applicable here. Say the Court, in part:

"Every government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal * * * that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it standing in court. * * * whenever the wrongs complained of are such as affect the public at large, and are in respect to matters which by the constitution are intrusted to the care of the nation, and concerning which the nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties. * * * Constitutional provisions do not change, but their operation extends to new matters, as the modes of business and the habits of life of the people vary with each succeeding generation."

This case arose before the Norris-LaGuardia Act was passed.

In United States v. International L. & W. Union, supra, the proceedings were taken under Sec. 206 et seq. of the Labor Management Relations Act (Taft-Hartley Act), and among other things the Court said [78 F.Supp. 712]:

"Certain of the defendants, contend that the provisions of the Act under discussion offend the First, Fifth and Thirteenth Amendments to the Constitution. The arguments on this phase, in the light of the factual setting, are not convincing. Congress designed the sections under attack to cope with 'national emergencies.' If the strike threat is carried out, such an emergency will inevitably follow, and there is a clear and imminent danger to the national health and safety." (Citing United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 and other cases.)

In U. S. v. International Union, supra, [89 F.Supp. 189] it was said:

"As to the constitutionality of Section 208, this provision comes well within the opinion expressed by the late Mr. Justice Brandeis, where he recognized the right of the legislature, as distinguished from the courts, to limit the area of industrial strife, in the following language, 'All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community. The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible

1. No opinion for publication.

contest and to declare the duties which the new situation demands. This is the function of the legislature which, while limiting individual and group rights of aggression and defense, may substitute processes of justice for the more primitive method of trial by combat.' "

In United States v. International Union, U. M. W. of A., supra, the validity and constitutionality of the Taft-Hartley Act is recognized because the proceeding was to punish for contempt the failure of the defendant to observe the order of the Court. Further in its Conclusions of Law, the District Court there said, "The statutory provisions of sections 206 to 208 of the Act, and all requirements therein contained, were duly and legally carried out both prior to and in the institution of this action by the United States of America". 77 F.Supp. at page 572. The defendant, as in the preceding case, claimed that the First, Fifth and Thirteenth Amendments of the Constitution were violated. Further the Court there found, as a conclusion of law, that it had jurisdiction of the subject matter.

In Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 866, in the prevailing opinion we find this language:

"The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself. There is no statute that expressly authorizes the President to take possession of property as he did here. Nor is there any act of Congress to which our attention has been directed from which such a power can fairly be implied."

Frequent reference is made to the lack of statutory authority. This would seem to imply that if statutory authority had been given this seizure would have been held to be legal. Justice Frankfurter in a concurring opinion in that case, 343 U.S. at pages 597–599, 72 S.Ct. at page 891, said:

"The question before the Court comes in this setting. Congress has frequently—at least 16 times since 1916 —specifically provided for executive seizure of production, transportation, communications, or storage facilities. In every case it has qualified this grant of power with limitations and safeguards. This body of enactments * * demonstrates that Congress deemed seizure so drastic a power as to require that it be carefully circumscribed whenever the President was vested with this extraordinary authority. * * Seizure statutes usually make executive action dependent on detailed conditions; * * *. No room for doubt remains that the proponents as well as the opponents of the bill which became the Labor Management Relations Act of 1947 clearly understood that as a result of that legislation the only recourse for preventing a shutdown in any basic industry, after failure of mediation, was Congress."

In a footnote Justice Frankfurter fortifies his statement by quoting from Senate Report 105, 80th Congress, 1st Sess. 15, as follows:

"In most instances the force of public opinion should make itself sufficiently felt in this 80-day period to bring about a peaceful termination of the controversy. Should this expectation fail, the bill provides for the President laying the matter before Congress for whatever legislation seems necessary to preserve the health and safety of the Nation in the crisis."

In his opinion in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. at page 668, 72 S.Ct. at page 929, Vinson, C. J., used very significant and appropriate language:

"Those who suggest that this is a case involving extraordinary powers should be mindful that these are extraordinary times. A world not yet recovered from the devastation of World War II has been forced to face the threat of another and more terrifying global conflict. * * * Congress, recognizing the 'grim fact * * * that the United States is now engaged in a struggle for survival' and that 'it is imperative that we now take those

necessary steps to make our strength equal to the peril of the hour,' granted authority to draft men into the armed forces."

It is to be noted that in several of the reported cases brought under the Taft-Hartley Act, it is claimed the Act is in violation of the First, Fifth and Thirteenth Amendments of the Constitution, while in the instant case it is charged that the Act violates Art. III, §§ 1 and 2. Whether the limitations in these two sections are treated as two different restrictions or as a single restriction is of no moment here. One states where the judicial power shall be based and the other specifies the extent of the judicial power.

The Union has quoted at length from Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60; McCulloch v. State of Maryland, 4 Wheat. 316, 4 L.Ed. 579; the Tidewater case, (National Mutual Ins. Co. v. Tidewater Transfer Co.), 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 and Youngstown Sheet & Tube Co. v. Sawyer, supra. These cases define in differing language "judicial power", as the meaning intended by the Constitution.

The Union lays much stress on the Tidewater case, which involved no question comparable here. The Union, however, seeks to cull out certain statements in that case. A general discussion is found in the opinion of the authority of Congress to legislate because of the provisions of Article III of the Constitution. It is not believed that the Tidewater case is conclusive of the issue here.

■ It is believed that this is a "controversy" within the meaning of that word in the Constitution and that as such it is appropriate for judicial determination. A controversy is definite and concrete and touches on the legal relations of the parties having a legal interest. Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617.

Article III, § 2, of the United States Constitution reads:

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, * * * Controversies to which the United States shall be a Party".

None of the cases cited by the Union are concerned with Sections 206 and 208 of the Taft-Hartley Act, which has been on the statutes nearly five years. If there were any merit in the claim that it is unconstitutional because it provides for judicial determination of matters which do not constitute a justiciable "case" or "controversy", in all reason it would likely have been asserted long before this date and especially in view of the well known opposition to the Act. The claim of unconstitutionality as violative of the First, Fifth and Thirteenth Amendments to the Constitution has heretofore been made, but nothing seems to have been said about Article III.

The Union urges that the Taft-Hartley Act purports to vest the court with jurisdiction over "administrative" matters and thus exceeded the restriction that the court is limited to cases and controversies. The apparent basis for this position is that the statute creates no legally enforceable rights as between the Union and the Company and that the Act does not make the strike illegal. When the Court is authorized to issue an injunction, there arises a liability to the Union and Company, not a liability for money damages but a liability which may been enjoined. Keller v. Potomac Electric Power Co., 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731; Gordon v. U. S. 117 U.S. 697. The related contention that the parallel injunction provisions of Section 160(j) of the Taft-Hartley Act, authorizing the National Labor Relations Board to obtain injunctions against unfair labor practices constitute an unconstitutional delegation of administrative duties to the courts has been rejected in numerous cases. Douds v. Local 1250, Retail Wholesale Department Store Union, 2 Cir., 170 F.2d 695; Printing Specialties and Paper Converters Union v. LeBaron, 9 Cir., 171 F.2d 331, 333, certiorari dismissed 336 U.S. 949, 69 S.Ct. 884, 93 L.Ed. 1105; Federal Trade Commission v. Thomsen-King Co., 7 Cir., 109 F.2d 516. The court proceedings are independent of the administrative procedure.

The Court must find the facts and it is not bound by the findings of the Review Board. The conditions for issuing the injunction are that the strike must affect an entire industry or a substantial part thereof; that the industry must be engaged in commerce or the production of goods for commerce, and that the national health or safety must be endangered.

The Union asserts that the emergency injunction provisions apply only to strikes within the industry, i. e., the Dunkirk plant. If that were true the strike would not affect an entire industry or a substantial part thereof. Were that construction to be followed the efficacy of the Act would practically be destroyed. Here then the Government would be unable to proceed against the Company and the Union, were it found that the strike did not affect a substantial part of the industry in which the Dunkirk plant was a part. To support the Union's contention, the Union quotes at considerable length from statements made in Congress when the Taft-Hartley bill was under consideration. These quotations seem wholly confined to the matter of industry wide strikes and while nothing seems to have been said about the phrase "or a substantial part thereof", this does not mean that Congress was unmindful of this limitation. Section 208(a) says, "an entire industry or a substantial part thereof". This language is so plain that anyone who runs may read and understand. The industry in question is the Atomic Energy Commission. The strike in effect is a strike against the Government. Repeated references were there made to "nation-wide strikes". Those statements were made at a time when the nation was engrossed in a nation-wide strike. Youngstown Sheet & Tube Co. v. Sawyer, supra. A construction that the Act is applicable only to nation-wide strikes would be erroneous for it would prevent action in many strikes affecting the national health and safety.

The struck plant and the Atomic Energy Industry are engaged in commerce or production of goods for commerce. The proofs show that ALCO ships its products in interstate commerce and the materials furnished for the Atomic Energy Commission are, when processed, delivered to foreign states and countries. Section 152(6) of the Taft-Hartley Act defines commerce as "trade, traffic, commerce, transportation or, communication among the several States * * * or between any foreign country and any State * * *." The atomic energy industry is owned by the Atomic Energy Commission, an agency of the Government, and it stands in the same relation as concerns trade between the States or between any foreign country and a State. Powell v. U. S. Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017; Carson v. Roane-Anderson Co., 342 U.S. 232, 72 S.Ct. 257.

The fact that the issuance of the injunction is in the Court's "discretion" is of no moment here. The questions are—is the Act constitutional and does the Court have jurisdiction. Of course, if the Act is unconstitutional there can be no question that there is no jurisdiction. Whether mandatory or discretionary the Court is not deprived of its equitable power. Hecht Co. v. Bowles, supra.

Section 1 of the Act states the purpose and policy of the Act in question. It reads in part:

" * * *. (b) Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.

"It is the purpose and policy of this chapter, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the

rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce." 61 Stat. 136, 29 U.S.C.A. § 141.

In United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 801, 83 L.Ed. 1211, the Court said:

"It is familiar doctrine that the extent to which a court of equity may grant or withhold its aid, and the manner of moulding its remedies, may be affected by the public interest involved."

During the Senate discussion of the Taft-Hartley Act it was said:

"Recognizing that the right to secure injunctive relief is subject to abuses, this bill is carefully drawn to guard against excessive resort to courts. It provides that the Attorney General shall not petition a federal court for such relief until he has convened a special board of inquiry to advise him in the matter." S.R. 105, 80th Cong., 1st Sess., p. 15.

It does not appear that plaintiff has any other adequate remedy than is sought in this suit.

No one can foretell the effect upon the Government and the people if this strike is continued. This is far from an ordinary controversy. It seems unthinkable that a strike in a plant producing for the Government items now vitally necessary to the defense of this country and the security of its people, should be permitted to continue.

After giving this matter careful and anxious attention, it is determined that:

(1) Sections 206 and 208 of the Labor Management Relations Act, 1947, are valid and constitutional;

(2) the Court has jurisdiction of the parties and of the subject matter of the suit;

(3) the motions of the defendant Union to dismiss the complaint and to dissolve or modify the temporary restraining order in this proceeding are denied; and

(4) the motion of the Government for a preliminary injunction is granted.

Findings may be submitted.