W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellee,

v.

NELLO L. TEER COMPANY, Appellant. No. 8797.

United States Court of Appeals Fourth Circuit.

Argued Jan. 22, 1963.

Decided March 7, 1963.

R. Roy Mitchell, Jr. (Charles B. Nye, Durham, N. C., on brief), for appellant.

Charles Donahue, Solicitor of Labor, United States Department of Labor (Bessie Margolin, Associate Solicitor, Jacob I. Karro and Beate Bloch, Attorneys, and Beverley R. Worrell, Regional Attorney, United States Department of Labor, on brief), for appellee.

Before SOBELOFF, Chief Judge, BELL, Circuit Judge, and MICHIE, District Judge.

MICHIE, District Judge.

The question here involved is whether certain work performed by the appellee, Nello L. Teer Company (hereinafter called Teer), on the Hartwell Dam and Reservoir project on the Seneca River in South Carolina was subject to the provisions of the Fair Labor Standards Act,[1] hereinafter called the "Act". And that in turn depends upon whether or not Teer's employees, in performing their work, were engaged in commerce within the meaning of the Act. The Secretary of Labor brought this suit under the provisions of the Act to enjoin Teer from violating the provisions of the Act contending that the employees were engaged in commerce. It is conceded that the Act

1. Act of June 25, 1938, c. 676, 52 Stat. 1060, as amended by the Fair Labor Standards Amendments of 1949, c. 736, 63 Stat. 910, 29 U.S.C. 201 et seq. The Fair Labor Standards Amendments of 1961 (75 Stat. 65) do not affect the issue in this case.

was violated if they were. But Teer contends that they were not so engaged. The District Court held that they were and we agree.

The Flood Control Act of May 17, 1950 (Public Law No. 516, 81st Cong., 2d Sess.) 64 Stat. 171 authorized the construction of the Hartwell Dam and Reservoir project as a part of "the general plan for the comprehensive development of the Savannah River Basin". The Savannah is formed by the junction of the Seneca River (on which the Hartwell Dam was built) and the Tugaloo River.

The operation of the Hartwell Dam will increase the minimum navigable depth of the Savannah River below Augusta, Georgia, from seven to eight feet. Its effect upon commerce is therefore obvious. Indeed Teer does not contend otherwise. But it does contend that the particular part of the work which it contracted to do did not relate to the dam or the functioning of the dam but "solely to the protection of certain properties of Clemson College from being inundated by rising waters of the Hartwell Reservoir" and therefore "solely to an isolated local purpose".

The basis for this contention is found in the following facts. The plan initially adopted for the Hartwell Dam by the Corps of Engineers was designated as Plan 660. In its original form Plan 660 would have resulted in the inundation of a great deal of land of Clemson College, including (heaven forbid!) the football stadium. The college authorities naturally objected and suggested alternatives and also referred to the very considerable expense involved in compensating the college for such a taking.

In view of this situation Congress authorized a restudy of the project as a result of which a plan thereafter referred to as Plan 660X (the original plan being thenceforth referred to as Plan 660A) was finally adopted. Plan 660X met most of the objections of Clemson though some of Clemson's land was still to be taken under either Plan X or Plan A. The cost of Plan X to the Government was estimated at about 1% ($25,000.00)[2] more than the cost of Plan A while it was expected to eliminate or reduce to a minimum lengthy and costly condemnation proceedings which would certainly have resulted had Plan A been adhered to. Consequently the restudy report recommended that Plan A be replaced by Plan X and this recommendation was adopted.

Teer was employed to do work on Plan X and, in effect, contends that it was not working on the overall Hartwell Dam project but merely on a plan to avoid the condemnation of a substantial quantity of Clemson's lands. However, it appears that work under either Plan A or Plan X or some project that fulfilled a similar purpose was essential to the accomplishment of the purposes of the Hartwell Dam project. And since employers engaged in the overall project were concededly engaged in commerce within the meaning of the Act such an employer would not appear to lose that status because the portion of the project upon which he was working was not a part of the plan as originally adopted but was substituted for another part of the plan for reasons having nothing to do with commerce. It or some other work giving substantially the same end result was essential to the accomplishment of the whole plan, the employees working on which were concededly engaged in commerce.

If plan X had been a part of the original overall Plan 660 no more contention could have been made that the employees working on the Plan X portion of the overall plan were not engaged in commerce than could have been made with respect to those working on any other part of Plan 660. The fact that the government decided, after initially approving Plan 660A, that the purposes of the overall Plan 660 could be more wisely

2. This "estimate" must, of course, have been pretty much of a "guesstimate" as obviously no one could estimate very accurately how much Clemson might have been awarded in condemnation proceedings if the original plan had been carried out.

accomplished, all things considered, by Plan 660X rather than Plan 660A in no way detracts from the fact that the whole project was a project to improve commerce on the Savannah River and that the government was free to choose the means to accomplish that purpose that seemed to it most suitable. And the motive which led to the selection of one method of improving commerce on the river rather than another method has no bearing on the question of whether employees engaged in the part of the overall project so selected were engaged in interstate commerce.

Teer relies, almost exclusively, on the case of Goldberg v. Wade Lahar Construction Co., 290 F.2d 408 (8th Cir., 1961), cert. denied, 368 U.S. 902, 82 S.Ct. 176, 7 L.Ed.2d 96. In that case the Corps of Engineers was engaged in developing a number of dams in the Arkansas and Missouri area for the purposes of flood control and production of power for interstate transmission and other purposes. When they began the work they followed a practice of clearing the entire reservoir area of each dam. Later they decided that this was not necessary and for the Table Rock Dam (out of the construction of which the Lahar case arose) they at first planned to clear less than five per cent of the reservoir area. This would have resulted in the tops of some trees rising above the level of the water in the reservoir, interfering with the operation of pleasure boats and other recreational activities on the reservoir. There were local protests against this change of policy from citizens, Chambers of Commerce and Congressmen from the area. In the face of this the plan was changed and instead of clearing only about two thousand acres of land approximately twelve thousand seven hundred (12,700) were cleared.

The Lahar case involved the application of the Fair Labor Standards Act to the work of clearing that was done solely for recreational purposes which "served no purpose in the protection or operation of the dam". 179 F.Supp. 560. Obviously the case is clearly dis-

tinguishable from the instant case where the carrying out of either Plan A or Plan X, one or the other, was essential to the improvement in commerce envisioned by the overall plan and the government clearly had a right to choose between two methods of accomplishing the desired result—which result in either case constituted an improvement in a facility of commerce.

It follows therefore that the judgment of the District Court must be, and is, affirmed.

Affirmed.