W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,

v.

ATLANTIC STATES CONSTRUCTION COMPANY, Appellee.

ATLANTIC STATES CONSTRUCTION COMPANY, Appellant,

v.

W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellee.

No. 21258.

United States Court of Appeals Fifth Circuit.

March 7, 1966.

U.S.C.A. § 201 et seq. This is the problem of whether the suit, instituted in fact by the Regional Attorney in the name of the Secretary of Labor constitutes one which *"the Secretary * * may bring * * * in any court of competent jurisdiction to recover the amount of such claim,"* 29 U.S.C.A. § 216(c).[1] (Emphasis added.) A substantive question of coverage, although compelling reversal, offers nothing new by way of legal principle or factual evaluation. The District Court held that the action was properly instituted. We agree and consequently reject the Employer's cross appeal. On the merits the District Court held, however, that building the new marginal wharf for the Port of Georgetown, South Carolina, was new construction not under the coverage of the Act. On the Government's appeal, we disagree and reverse.

I

*Suit Properly Commenced*

The background of this problem is adequately summarized in the Government's brief. Subsequent to the receipt by the Labor Department's Regional Attorney in Birmingham of written requests by certain of Employer's former employees for recovery of their unpaid wages, this suit was filed in the Secretary of Labor's name by that Regional Attorney. It was stipulated that the Secretary did not personally see the employee requests, nor did he personally pass upon the bringing of this particular lawsuit prior to its being instituted.

After objections to the Regional Attorney's institution of this action were

---

Bessie Margolin, Assoc. Sol., Dept. of Labor, Robert E. Nagle, Atty., Dept. of Labor, Washington, D. C., for appellant.

Thomas T. Purdom, Decatur, Ga., James C. Grizzard, Grizzard & Simons, Atlanta, Ga., for appellee.

Before BROWN and COLEMAN, Circuit Judges, and GARZA, District Judge.

JOHN R. BROWN, Circuit Judge:

Only one question raises this case ever so slightly above the routine action by the Secretary of Labor on behalf of individual workers seeking recovery of minimum wages under the FLSA, 29

---

1. Section 16(c) of the Act (29 U.S.C.A. § 216(c)) reads in pertinent part as follows:

"The Secretary of Labor is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee or employees under section 206 or section 207 of this title, * * *. When a written request is filed by any employee with the Secretary of Labor claiming unpaid minimum wages or unpaid overtime compensation under section 206 or section 207 of this title, the Secretary of Labor may bring an action in any court of competent jurisdiction to recover the amount of such claim: *Provided,* That this authority to sue shall not be used by the Secretary of Labor in any case involving an issue of law which has not been settled finally by the courts, and in any such case no court shall have jurisdiction over such action or proceeding initiated or brought by the Secretary of Labor if it does involve any issue of law not so finally settled."

asserted by the Employer, the Secretary of Labor filed an affidavit in which he pointed out that enforcement functions under the Act, originally assigned by statute to the Wage-Hour Administrator, were transferred to the Secretary by Reorganization Plan No. 6 of 1950, 64 Stat. 1263; and that by Departmental General Order No. 45A of May 24, 1950 (15 Fed.Reg. 3290) the Secretary had reserved to himself the bringing of legal procedures under the Act, with "the determination in each case whether such proceedings are appropriate to be made by the Solicitor of Labor." It was further stated that by General Order No. 78 of October 14, 1954, the Secretary had provided that the Solicitor of Labor, as chief law officer for the Department, shall be responsible "for the performance of all necessary legal services" for the Department. Accordingly, the Secretary's affidavit pointed out, the Solicitor, on behalf of and in the name of the Secretary, is authorized without further clearance or review to initiate all civil litigation under the Fair Labor Standards Act; and in view of his many responsibilities the Solicitor "with the knowledge and consent of my predecessors in office and with my knowledge and consent, has authorized the Regional Attorneys for the United States Department of Labor at Birmingham, Alabama, and elsewhere to act for him" in the institution and handling of certain civil cases arising under the Act.[2] The affidavit concluded by expressly approving the action taken in the instant case, stating:

"[T]he Regional Attorney for the United States Department of Labor at Birmingham, Alabama, in the exercise of authority so delegated to him, properly determined that civil action under Section 16(c) of the Act was appropriate herein and, upon proper request of the affected employees, acting for and on behalf of the Solicitor of Labor as the chief law officer of the Department, instituted the instant action in the name of the Secretary of Labor for the relief sought."

On the basis of this affidavit, the District Court, although expressing "grave doubt" as to whether the Secretary might properly delegate "to a large number of Regional" Attorneys the authority to institute suit, held that the Secretary's ratification of the bringing of this action supplied the necessary authority.

■ This doubt, generated presumably by Cudahy Packing Co. of Louisiana v. Holland, 1942, 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895, is not shared by us. The legislative history of the subpoena-issuing power under § 9 of FLSA played a big part in that decision. At issue was whether the Administrator could delegate the issuance of subpoenas. On that precise question the legislative history, the Court emphasized, "shows that the authority to delegate the subpoena power was eliminated by the Conference Committee from the bills which each House had adopted." 315 U.S. at 366, 62 S.Ct. at 656, 86 L.Ed. at 900.

But here no congressional purpose prohibiting delegation may be discerned.

■ At the outset, Reorganization Plan No. 6 of 1950, which transferred to the Secretary the functions previously assigned by statute to other officers of the Department (including the Wage and Hour Administrator), specifically provides that the Secretary may "[authorize] the performance by any other officer, or by any agency or employee, of the Department of Labor of any function of the Secretary * * *."[3] Courts

---

**2.** An Affidavit was also filed by the Solicitor of Labor similarly stating that the Department's Regional Attorney at Birmingham had been authorized to determine the appropriateness of legal action in certain cases and that the instant case was filed in accordance with such authority.

**3.** Reorganization Plan No. 6 of 1950, 15 Fed.Reg. 3174, 64 Stat. 1263, adopted pursuant to the Reorganization Act of 1949, 5 U.S.C. §§ 133z to 133z–15, provides:

"Except as otherwise provided * * * with respect to hearing examiners, there are hereby transferred to the

have held that comparable language in the Emergency Price Control Act authorized the delegation to district directors of the Office of Price Administration of power to issue subpoenas,[4] as well as the delegation to regional attorneys of that agency of discretion to determine whether to institute enforcement actions in the name of the Price Administrator.[5] Moreover, we agree with the Government's contention that quite apart from express statutory grant of power to redelegate, the Secretary of Labor as the head of an executive department has what the Court has described as "a general power of delegation" under the rule-making provisions of 5 U.S.C.A. § 22.[6] In Cudahy Packing Co. of Louisiana v. Holland, supra, 315 U.S. at 366, 62 S.Ct. at 656, 86 L.Ed. at 900, the Supreme Court reasoned that had the responsibility for issuing subpoenas been assigned to the Secretary, who has rule-making power, rather than to the Wage-Hour Administrator, who does not, § 22 would have sufficed to support the delegation of that authority. See Fleming v. Mohawk Wrecking & Lumber Co., supra, 331 U.S. at 121, 67 S.Ct. at 1134, 91 L. Ed. at 1385. Other decisions have similarly held that the rule-making powers of § 22 or other comparable statutes warranted the delegation of departmental discretionary functions.[7]

Unless, as in *Cudahy*, the statutory agent is hemmed in, the "administrative flexibility necessary for prompt and expeditious action on a multitude of fronts," Fleming v. Mohawk Wrecking & Lumber Co., supra, 331 U.S. at 122, 67 S.Ct. at 1135, 91 L.Ed. at 1385, points in the direction of allowing more, not less, delegation. To argue for non-delegability in those situations in which Congress has not spoken explicitly and thereby insist upon personal performance by the Executive or the Chief Statutory Administrative Office envisages many unsatisfactory results. It will mean less, not greater, attention to the intrinsic merits of each situation requiring action. It will make governmental bureaucracy more, not less, formidable and frustrating. And certainly this would be true in the administration of this Act which

---

Secretary of Labor all functions of all other officers of the Department of Labor and all functions of all agencies and employees of such Department. * * * The Secretary of Labor may from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the Department of Labor of any function of the Secretary, including any function transferred to the Secretary by provisions of this reorganization plan."

4. Fleming v. Mohawk Wrecking & Lumber Co., 1947, 331 U.S. 111, 67 S.Ct. 1129, 91 L.Ed. 1375.

5. Bowles v. Wheeler, 9 Cir., 1945, 152 F.2d 34, cert. denied, 326 U.S. 775, 66 S.Ct. 265, 90 L.Ed. 468; Bowles v. Chas. A. Krause Milling Co., E.D.Wis., 1945, 62 F. Supp. 244; Bowles v. Slater, E.D.Mich., 1945, 64 F.Supp. 387.

6. 5 U.S.C.A. § 22 provides: "The head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it."

7. E. g., delegation by the NLRB to its regional directors of discretion to initiate court proceedings for interlocutory injunctive relief, Evans v. International Typographical Union, S.D.Ind., 1948, 76 F. Supp. 881, 888–889; Penello v. International Union, UMW, D.D.C., 1950, 88 F. Supp. 935, 937; Madden v. International Union, UMW, D.D.C., 1948, 79 F.Supp. 616, 617, 622; delegation by the NLRB to its trial examiners to make preliminary rulings on motions to revoke subpoenas *duces tecum*, NLRB v. Duval Jewelry Co., 1958, 357 U.S. 1, 78 S.Ct. 1024, 2 L. Ed.2d 1097; Lewis v. NLRB, 1958, 357 U.S. 10, 78 S.Ct. 1029, 2 L.Ed.2d 1103; delegation by the Postmaster General to his Acting Solicitor of authority to hear and receive evidence in fraud order cases, Plapao Labs. Inc. v. Farley, 1937, 67 App. D.C. 304, 92 F.2d 228, cert. denied, 302 U.S. 732, 58 S.Ct. 56, 82 L.Ed. 566; delegation by Postmaster General to the Third Assistant Postmaster General of authority to determine matters pertaining to second-class mailing privileges, Lewis Publishing Co. v. Wyman, E.D.Mo., 1907, 152 F. 787.

in the final analysis is court-enforced without the intervention of any administrative agency. It is absurd to think, or to think that Congress would think, that the Secretary of Labor faced with his multitudinous statutory obligations in a hundred different areas should have the further responsibility of personally passing upon each of the hundreds and hundreds of legal actions filed each year in the enforcement of FLSA.[8]

■ Moreover, this record leaves without the faintest shadow of a possible suggestion of a doubt the fact that the Secretary of Labor has ratified the initiation and prosecution of this action. This express ratification by the Secretary of Labor as well as the Solicitor (see note 2, supra and accompanying text) was taken against the background of the Departmental General Orders promulgated subsequent to the Reorganization Plans transfer to the Secretary of responsibility for administration and enforcement of the FLSA (see note 3, supra). These Departmental General Orders assigned to the Solicitor the responsibility for making "the determination in each case whether such [legal] proceedings are appropriate" (No. 45A), and for performing "all necessary legal services" for the Department (No. 78). Following this up, the Solicitor, with the knowledge

and consent of the Secretary and his predecessors, thereafter authorized the respective Regional Attorneys of the Labor Department to act for the Solicitor and in turn·for the Secretary in the institution and prosecution of these civil cases arising under the Act. And again, as a matter of ratification, the Secretary in the most sweeping terms stated under oath that the Regional Attorney had "properly determined that civil action under Section 16(c) of the Act was appropriate" and therefore had "instituted the instant action in the name of the Secretary of Labor for the relief sought." [9]

## II

### Coverage

The employees in question were engaged, during the period January 7, 1959 to November 17, 1959, in constructing a port facility at Georgetown, South Carolina, consisting of a marginal wharf, transit shed, and related appurtenances. This installation, located on the navigable waters of the Sampit River, and designed to accommodate ocean-going vessels, was built by the Employer under contract with the South Carolina State Ports Authority.

The Ports Authority itself is an agency created by the State Legislature in

8. It is estimated that 28 million employees and 1.2 employers are covered by the FLSA. During fiscal year 1965, the Office of the Solicitor instituted 1,432 cases under the FLSA:

| | |
|---|---|
| Civil Actions | |
| Uncontested | 163 |
| Contested | |
| § 16(c) suits for employees* | 208 |
| § 17 injunctions | 619 |
| § 17 injunctions with prayer for minimum or overtime wages | 361 |
| Misc. | 6 |
| Contempt | 50 |
| Criminal Actions | ·25 |
| TOTAL | 1,432 |

* After the 1961 amendment to § 17, Pub.L. 87–30, 75 Stat. 74, provided for the payment of minimum or overtime wages in injunction suits, many of the actions formerly brought un-

der §·16(c) are now brought under § 17. 29 U.S.C.A. §§ 216, 217.

See generally U. S. Dept. of Labor, 53d Annual Report.

Frequently the time available for decision is short. See, e. g., two-year statute of limitation, 29 U.S.C.A. § 255(a). And there must be a preliminary determination of whether the potential suit involves "an issue of law which has not been settled finally by the courts," 29 U.S.C.A. § 216(c), note 1, supra.

9. Nothing in Rogers v. Skinner, 5 Cir., 1953, 201 F.2d 521, so heavily labored by the Employer, is at odds with what we do here. Immediately involved there was the authority of the Regional Director, not Regional Attorney, and to it was added the then knotty problem of indispensable parties now largely eliminated by virtue of 28 U.S.C.A. § 1391(e).

1942 in order "[t]o develop and improve the harbors or seaports of Beaufort, Charleston and Georgetown for the handling of water borne commerce from and to any part of the State of South Carolina and other states and foreign countries" and "[t]o foster and stimulate the shipment of freight and commerce through said ports." S.C.Laws 1942, Act No. 626, as amended, S.C.Code Ann. § 54–1 et seq.

By 1942 the use of Georgetown as a port had reached a low ebb because of lack of a deep water ship channel for navigation by ocean-going vessels. Accordingly, at the close of World War II, the Ports Authority with others succeeded in obtaining congressional authorization and appropriations for such a project. A 27-foot channel, with harbor and turning basin permitting access by ocean-going vessels, was completed in 1949 under the direction of the U. S. Army Corps of Engineers. With the completion of the deep-water channel came much water commerce, and by 1955 there had been a marked increase in the use of the port for both export and domestic shipments. The United States Engineers' officially-required statistics showed that for 1954 the tonnage handled in the Port was 968,000 tons. The principal cargo consisted of products manufactured by the International Paper Company, which at that time owned Georgetown's only dock—a smaller, open wharf—but some general cargo had also developed.

But because the ports of South Carolina were under considerable competitive pressure from the ports of neighboring states, and particularly from the construction and expansion of dock facilities in Savannah, Georgia, and Wilmington and Morehead City, North Carolina, it was recognized that added facilities were required "[i]f South Carolina is to maintain and advance her maritime leadership" and "take care of future expanded commerce and industry." [10]

In 1957, the State legislature conscious that South Carolina seaports "are furnishing progressively important services" to the commerce of the State, authorized a bond issue of $21 million to pay for the construction of "adequate modern docking facilities for the seaports of Beaufort, Georgetown and Charleston." [11] Of this amount the Authority allocated $1.5 million for the work to be performed at Georgetown.

Although the privately owned International Paper Company wharf at Georgetown was at that time available for vessels, the Authority purchased about 12 acres of land approximately 500 yards from the existing dock. It contracted with the Employer for the construction of all the new facilities. These comprised a marginal wharf, transit shed, railroad tracks and approach trestle, truck loading dock and approach roads, and other accessories.

The Georgetown project, designated as State Pier 31, was completed in November 1959. In accordance with the original intent and design, it was incorporated into the existing system of port facilities operated by the Authority. The new facility makes it possible for South Carolina to handle such commodities as tobacco and lumber for export and wool and general cargo for import, which could not be so readily handled at the State's other two ports because of their distance from Virginia, North Carolina, and upper South Carolina.

The trial Court recognized, of course, that on completion this facility "would be an instrumentality in interstate commerce" for the obvious reason that it was accessible by land to U. S. Highway 17 and the tracks of the Seaboard Airline Railway Company. It recognized also that the facility "would become of value to the state by attracting industry * * and stimulating trade." But it nonetheless held that its construction did not constitute engaging "in commerce" within the coverage of FLSA. The Court

10. S. C. State Ports Authority, Summary of Activities 1942–1955.

11. S. C. Laws 1957.

reasoned that since this was the construction of "a new port," which was "an independent instrumentality as to its physical operations from the other ports in [the] state," the work "could not be said to constitute repair or maintenance of an existing interstate instrumentality, nor an addition to or improvement of any interstate instrumentality."

But on this brief sketch of uncontradicted facts, it is now, and was at the time this work commenced, perfectly plain that this project was not the creation of an entirely new facility unrelated to existing major facilities for the movement of water-borne interstate and foreign commerce. To think that building a new dock was initiating for the Port of Georgetown a new activity is to ignore history in which South Carolina and its Ports made such a contribution in the pre- and post-revolutionary political-economic developments. This historical importance was reiterated by the 1942 establishment of the Ports Authority as the effective agency for fulfilling South Carolina's role as a maritime state. And more recently, in 1949, there had been major and expensive improvements made so that the Port of Georgetown afforded a deep water channel and harbor which in 1954 handled nearly a million tons of cargo.

It was to expand, not create, that the new dock, marginal wharf shed with rail-truck access was to be built. Adding to the existing, but limited, private wharf, this would—as events soon demonstrated —permit a wide expansion in the volume and nature of water-borne commerce and the flow of spendable wealth following in the wake of every arriving vessel. And for this project, from the point of view of the South Carolina Ports Authority, this is true whether the focus is on the port of Georgetown alone or, quite properly, the broader appraisal of the related and nearby ports of Beaufort (Port Royal) and historic Charleston.

■ The one thing this project was not was localized, local construction. It was to come into being solely because there was an existing, operable, accessible instrumentality of commerce. The project's role was clear before the first sketch was drafted. The moment of its completion, it would be a busy, important part of South Carolina's expanding maritime commerce to and from all parts of the globe. That it was, like any other new facility, "new construction" is no answer. That merely states the problem. Viewed as it must be by "practical considerations," Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 429, 75 S.Ct. 860, 862, 99 L.Ed. 1196, 1200, building of this important addition to facilities for maritime commerce was an activity in commerce. The only wonder at this late date is how it could have been thought to be otherwise. See Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 313, 80 S.Ct. 739, 742, 4 L.Ed.2d 753, 758. See also Mitchell v. Lublin, McGaughy & Associates, 1959, 358 U.S. 207, 213, 79 S.Ct. 260, 264, 3 L.Ed.2d 243, 248; Archer v. Brown & Root, Inc., 5 Cir., 1957, 241 F.2d 663, cert. denied, 355 U.S. 825, 78 S.Ct. 33, 2 L.Ed.2d 39; Mitchell v. Hodges Contracting Co., 5 Cir., 1956, 238 F.2d 380; Mitchell v. Empire Gas Engineering Co., 5 Cir., 1958, 256 F.2d 781; Goldberg v. Five Boro Constr. Corp., 1 Cir., 1961, 291 F.2d 371, cert. denied, 368 U.S. 900, 82 S.Ct. 179, 7 L.Ed.2d 95; Goldberg v. Nello L. Teer Co., M.D.N.C., 1962, 208 F.Supp. 552, aff'd Wirtz v. Nello L. Teer Co., 4 Cir., 1963, 314 F.2d 759.

### III

#### Settled Law

■■ The Employer's final contention that the trial Court lacked jurisdiction under the proviso to § 16(c) since the question of coverage had "not been settled finally by the courts," 29 U.S.C.A. § 216(c), note 1, supra, falls with the analysis in Part II. The coverage principles are now clearly revealed and a novel case is not contrived by urging incidental factual variations which are inescapably present in our Article III case and controversy approach. Mitchell v. Emala & Associates, Inc., 4 Cir., 1960, 274 F.2d 781, 782–783, cited with ap-

proval in Mitchell v. C & P Shoe Corp., 5 Cir., 1961, 286 F.2d 109, 113–n. 10; Mitchell v. Independent Ice & Cold Storage Co., 5 Cir., 1961, 294 F.2d 186, 189.

The result is that the Government is right on its main appeal, and the cause must be reversed and remanded for the entry of appropriate judgments. The Employer is wrong on its cross appeal with consequent affirmance.

Reversed and remanded on main appeal.

Affirmed on cross appeal.