703 F.2d 1297
 227 U.S.App.D.C. 75
 DANA CORPORATION, Ford Motor Company, General Motors
Corporation, Checker Motors Corporation, Budd
Company, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Consolidated Rail Corporation, et al., Intervenors.
 No. 82-1022.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 5, 1982.
Decided April 1, 1983.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Dennis J. Helfman, Detroit, Mich., and Frederic L. Wood, Washington, D.C., with whom John F. Donelan, John K. Maser, III, Washington, D.C., David Larrouy, Dearborn, Mich., and Benson T. Buck, Detroit, Mich., were on the brief, for petitioners.
 Sidney L. Strickland, Jr., Attorney, I.C.C., Washington, D.C., with whom John H. Broadley, Gen. Counsel, and Henri F. Rush, Associate Gen. Counsel, I.C.C., John J. Powers, III, and Kenneth P. Kolson, Attorneys, Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 John A. Daily, Philadelphia, Pa., for intervenors.
 Before WRIGHT, WILKEY and SCALIA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SCALIA.
 SCALIA, Circuit Judge:
 
 
 1
 Petitioners appeal under 28 U.S.C. Secs. 2321(a), 2342(5) (1976) the action of the Interstate Commerce Commission in holding that storage rates assessed by several railroads were not unreasonable. Their challenge raises issues regarding the Commission's compliance with its own procedures, the standard of review applicable to the Commission's determinations, and the legal sufficiency of the determinations themselves.
 
 
 2
 The shipment of gear frames, rectangular steel bases upon which automobile body, engine, transmission and drive train assemblies are mounted, requires specially equipped flat cars. Because these cars contain appurtenances which severely limit their usefulness for carrying goods other than the specific frames for which they have been designed, they are generally set aside for the exclusive use of particular shippers. During the period here at issue, such exclusive assignment was arranged pursuant to Rule 16 of the Commission's Car Service Rules, 49 C.F.R. Sec. 1033.16 (1979), which permitted the carrier to reject all or part of a car assignment request, and enabled either shipper or carrier to terminate the assignment on one day's written notice.[1]
 
 
 3
 In 1977, for the first time, a number of carriers began charging "storage rates" for periods during which the specially equipped cars were not in revenue-producing ("line-haul") use. On November 3, 1978, affected shippers filed a complaint with the Interstate Commerce Commission seeking a cease and desist order against these charges and reparation for charges already paid. They alleged violation of various provisions of the Interstate Commerce Act,[2] notably Title 49 U.S.C. Sec. 10701 (Supp. IV 1980), which requires rates and practices to be reasonable; Sec. 10741, which prohibits unreasonable discrimination in rates; Sec. 10750, which requires demurrage charges to be computed in a manner that fulfills the national needs relating to the use, distribution and supply of freight cars; and Sec. 11121, which requires railroads to furnish adequate car service and to enforce reasonable rules and practices concerning the same. One of the two principal bases of the complaint was that the daily charges for the cars (which applied only when they lay idle) were excessive, in part because the railroads' line-haul rates for the relevant commodities included compensation for assignment of the cars as well. That ground was rejected at every level within the Commission; we do not understand it to be pressed on this appeal, but in any event find sufficient evidence to support the Commission's determination that the level of the daily charges, taking into account the line-haul rates, was not shown to be more than compensatory.[3] The other principal ground, as well as the procedures followed by the Commission in disposing of the complaint, is the matter before us here: Petitioners asserted that the idleness of the cars was attributable to the carriers' erratic delivery, which caused alternate unavailability and "bunching" at their facilities. They contended that charging them for the idleness produced by the carriers' own fault was both unreasonable and contrary to the practice required by the Commission in other demurrage and storage cases.
 
 
 4
 Relying on the rule of Ormet Corp. v. Illinois Central R.R., 341 I.C.C. 647 (1972), the administrative law judge held that the storage charges should be remitted in their entirety since "the shippers and receivers here have exercised due diligence ... it is in their own best interests to insure prompt return of the cars to service, and ... the major cause of the idle time is attributable to the defendants." Dana Corp. v. Atchison, Topeka & Santa Fe Ry., I.C.C. No. 37072 at 8, Jt.App. at 695 (June 26, 1979) [hereinafter cited as ALJ Decision]. The Commission's Review Board affirmed, not on the basis of Ormet, but because "the slow transit times and erratic rail service (whether caused by track conditions, bad order cars, or the low productivity of railroad employees all of which are within defendants' control) when coupled with the severely restrictive conditions of the assailed storage rule, combine to constitute an unreasonable practice." Dana Corp. v. Atchison, Topeka & Santa Fe Ry., I.C.C. No. 37072 at 5, Jt.App. at 726 (Jan. 18, 1980).
 
 
 5
 The Acting Chairman of the Commission stayed the Review Board decision, and the Commission subsequently reversed it in two separate opinions. It first held that storage charges were not unreasonable per se when the duration of the storage depended on the conduct of both parties. Dana Corp. v. Atchison, Topeka & Santa Fe Ry., I.C.C. No. 37072 at 5, Jt.App. at 796 (Sept. 3, 1980) [hereinafter cited as Dana I]. While that decision was on appeal to this court, the Commission withdrew its opinion for lack of sufficient findings, see Order (Mar. 9, 1981), Jt.App. at 799, and subsequently issued a second opinion which held that the imposition of non-remittable storage charges was not in and of itself an unreasonable practice and that the level of line-haul and storage charges together had not been shown unreasonable. Dana Corp. v. Atchison, Topeka & Santa Fe Ry., I.C.C. No. 37072, Jt.App. at 867 (Nov. 9, 1981) [hereinafter cited as Dana II]. That opinion offered two bases for its former conclusion. First, the carriers were not the cause of the delay within the meaning of Ormet, since the service problems were not the result of carrier action but of deterioration of equipment and plant inherited from Conrail's predecessors, and since the shippers did not design their manufacturing processes to allow for fluctuation in the number of cars to be loaded and were unwilling to release cars from assigned service. Second, Ormet did not apply because the storage charge was essentially different in its nature and purpose from traditional demurrage charges.
 
 PETITIONERS' PROCEDURAL CLAIMS
 
 6
 Four procedures employed in the proceeding are challenged as contrary to the Commission's regulations, all relating to the stay of the Review Board's order. Two involve timing aspects: the Commission's acceptance of a petition for stay that was filed late, and its issuance of a stay after the Board's decision had become effective. The other two touch upon the delegated authority of the Acting Chairman: his authority to issue a stay pending administrative review, and to make the finding of "general transportation importance," necessary to grant Commission reconsideration, 49 U.S.C. Sec. 10327(g)(2)(A) (Supp. IV 1980).
 
 
 7
 None of these procedural challenges is valid. The Commission has not violated its own rules, given the broad discretion it is accorded in interpreting them. See Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). As far as the timing rules are concerned, no specific sanction is set forth for noncompliance with the filing deadline, 49 C.F.R. Sec. 1100.98(c)(3) (1981), and while 49 C.F.R. Sec. 1100.98(c)(7)(i) (1981) specifically provides for the stay of a decision prior to its effective date, it does not specifically preclude a stay thereafter. In light of the Commission's overriding responsibility to protect the public interest, we do not think it necessary to imply either an absolute requirement for dismissal of late filed petitions or an inability to stay arguably erroneous determinations after their effective date. That is especially the case since these are provisions designed not primarily to safeguard private rights but rather to facilitate the Commission's orderly transaction of its business. The Supreme Court has said that " '[i]t is always within the discretion of a court or administrative agency to relax or modify [such] rules ... when in a given case the ends of justice require it,' " and that such action " 'is not reviewable except upon a showing of substantial prejudice to the complaining party.' " American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970), quoting NLRB v. Monsanto Chemical Co., 205 F.2d 763, 764 (8th Cir.1953). See also Papago Tribal Utility Authority v. FERC, 628 F.2d 235, 241 (D.C.Cir.1980); Note, Violations by Agencies of Their Own Regulations, 87 HARV.L.REV. 629, 629-30 & nn. 2-5 (1974) (citing cases). No substantial prejudice is apparent in this case, as petitioners effectively concede when they disclaim any desire to "relitigate the merits of the stay." Petitioners' Brief at 27.
 
 
 8
 As for the Acting Chairman's authority to issue the stay and to make the "general transportation importance" finding: Again the regulations can reasonably be read to permit what has occurred. The Acting Chairman has the authority of the Chairman, 49 C.F.R. Sec. 1011.4(a)(3) (1981). Under 49 C.F.R. Sec. 1011.5(a)(2) (1981), the Chairman has the power to grant "[e]xtensions of time for compliance with orders and procedural matters in any formal case or pending matter." That this includes a stay of the effectiveness of an order pending appeal within the Commission is suggested by (1) the fact that the following paragraph of the regulation explicitly gives the Chairman the much greater power to grant a stay of the Commission's own orders pending judicial appeal, 49 C.F.R. Sec. 1011.5(a)(3), and (2) the fact that the last subsection of the regulation explicitly describes paragraph (a)(2) as embracing administrative stay authority, when it requires the Chairman to "give notice to all Commissioners that a petition for a stay has been referred to him or her for disposition pursuant to the delegation of authority in paragraphs (a)(2) and (a)(3)." 49 C.F.R. Sec. 1011.5(d).
 
 
 9
 The statute does not require any finding of "general transportation importance" in order to issue a stay, but only in order to accord reconsideration. 49 U.S.C. Sec. 10327(g)(2)(A) (Supp. IV 1980). At most it can be argued that a stay in order to permit reconsideration must include a finding that there is a likelihood of general transportation importance. To the extent this finding is needed, granting the Chairman the authority to issue the stay necessarily grants him the authority to make the finding. And such a more limited finding in no way infringes upon the Commission's exclusive power ultimately to determine "whether issues of general transportation importance are involved," 49 C.F.R. Sec. 1011.2(a)(7) (1981), since after the stay has been granted the Commission retains the power to deny reconsideration and lift the stay. Finally, even if there were serious problems of authorization involved, the full Commission, by upholding the Acting Chairman's stay, ratified his action and made it its own. See Wirtz v. Atlantic States Construction Co., 357 F.2d 442, 446 (5th Cir.1966).
 
 PETITIONERS' SUBSTANTIVE CLAIMS
 The Standard of Review
 
 10
 In turning to petitioners' substantive claims, we are faced at the outset with a dispute regarding the standard of review to be applied. Petitioners assert that both the "arbitrary and capricious" standard of 5 U.S.C. Sec. 706(2)(A) (1976) and the "substantial evidence" standard of 5 U.S.C. Sec. 706(2)(E) are applicable. Respondents contend that with regard to the issues raised by petitioners, only the former applies. We find it unnecessary to resolve this issue. If there is any difference between the two tests with regard to the degree of factual support that they demand,[4] we find that the degree required by the arbitrary and capricious test, which would presumably be the less stringent of the two, has not been met. As discussed below, a "reasoned conclusion from the record as a whole," City of Chicago v. FPC, 458 F.2d 731, 745 (D.C.Cir.1971), cannot support the premise on which the Commission's action rests.
 
 Existence of Carrier Fault
 
 11
 Proceeding to the merits of petitioners' substantive claims, we find inadequate the first basis upon which the Commission relied: the nonexistence of any carrier fault that would justify the remission of charges pursuant to the principles ordinarily applied in demurrage cases. To begin with, it should be noted that this basis would not in any event support the Commission's refusal to issue a cease and desist order against nonremittable storage charges in the future. The fact that they did not need to be remitted in the past (because no carrier fault existed) cannot establish that they may reasonably be freed from liability to remission in the future.
 
 
 12
 Even as applied to remission of past charges, however, the Commission's finding of no carrier fault cannot be sustained. The Commission's opinion gives two reasons for that finding: First, it asserts that earlier demurrage cases penalizing carriers involved detention caused by "carrier actions," whereas in the present case "the service problems were caused in part by deteriorated equipment and physical plant which may be attributable to Conrail's predecessors, not Conrail or Conrail actions." Dana II at 7, Supp.Jt.App. at 873 (emphasis in original). The qualifying phrase "in part" and the verb "may" might alone be sufficient to deprive this justification of its effect. Passing that, however, the record does not contain the requisite evidence to support a determinative, factual finding that each deficiency complained of was (even in part) so caused. Additionally, even if the finding were valid it would only apply to Conrail and not to the other carriers against whom charges were sought. Finally and most importantly, the distinction between action and inaction--or between poor facilities attributable to a current carrier and those originally attributable to its predecessor--is not supportable. All carriers subject to the jurisdiction of the Commission are required by law to "provide ... transportation or service on reasonable request," 49 U.S.C. Sec. 11101(a), and rail carriers to "furnish safe and adequate car service," 49 U.S.C. Sec. 11121(a). The justifications for inadequacy of service do not include inheritance of controllable conditions from one's predecessors. In inheriting the poor conditions, Conrail has inherited the fair reduction in revenues that goes along with them. The Commission cites no precedent for its extraordinary assertion to the contrary.
 
 
 13
 The Commission's second reason for finding no carrier fault is its determination that "[t]he bunching problem experienced is also caused by complainants' production schedules," which "are not designed to allow for fluctuation in the number of cars which can be used for loading." Dana II at 8, Supp.Jt.App. at 874. This amounts to the proposition that shippers must accommodate themselves to the carriers' convenience--which makes a nullity of the statutory requirement that rail carriers "furnish ... adequate car service," 49 U.S.C. Sec. 11121(a)(1). We do not understand petitioners to demand that the carriers adjust to fluctuations in their production schedules, but only to demand--precisely what the case relied upon by the Commission entitles them to demand--"transportation with reasonable dispatch." Del E. Webb Construction Co. v. Panhandle & S.F. Ry., 292 I.C.C. 279, 285 (1954), cited in Dana II at 8, Supp.Jt.App. at 874. It is one thing to say that the carriers need not provide for variation in the shippers' production schedule; it is quite another to assert, as the Commission appears to maintain, that the mere existence of such variation excuses the railroads from the obligation to forward cars promptly. That is particularly inequitable when the shippers are to be charged for storage of cars ordered in the numbers necessary to take account of such variation.
 
 
 14
 Our review of the record discloses ample evidence of carrier fault--evidence which was the basis for the findings of the administrative law judge and the Review Board against the carriers, and the Commission's own acknowledgment in its first opinion that "delivery of the cars was somewhat erratic." Dana I at 4, Supp.Jt.App. at 795. The Commission has not denied the existence of such fault; its assertion that "the carriers normally offer a dependable service, providing cars on a regular basis," Dana II at 8, Supp.Jt.App. at 874, falls short of the mark. Denial of relief in the abnormal cases remains to be explained. The only across-the-board refutation of carrier fault was based on the two impermissible justifications just discussed. Therefore, the Commission's denial of all remission on this ground alone cannot be sustained.
 
 
 15
 Storage Charges Unaffected by Carrier Fault
 
 
 16
 The principal ground upon which the Commission relied, however, is the lack of any necessity for remission in the case of carrier fault, because of the distinctive character of the storage charges at issue. Specifically, the Commission said that "demurrage principles, applicable on demurrage charges, track storage charges, and some forms of general storage charges, are [not] relevant to the charges considered here because no penal element is involved, the shippers are paying for a more direct benefit, and the charges have a different purpose." Dana II at 7, Supp.Jt.App. at 873 (footnote omitted). To evaluate this ground it is necessary to describe briefly the nature and purpose of ordinary storage and demurrage charges.
 
 
 17
 With respect to railroads, demurrage is defined as "a charge exacted by a carrier from a shipper or consignee on account of a failure on the latter's part to load or unload cars within the free time prescribed by the applicable tariffs." Black's Law Dictionary 389 (5th ed. 1979). Similar charges, called "storage charges," are tariffed and imposed for use, beyond a prescribed free time, of a carrier's track or storage facilities. As said in the Commission's leading case on the subject, ordinary storage or demurrage charges contain two elements--"compensation for the use of the car and a penalty to ensure prompt return of the equipment to public service." Ormet Corp. v. Illinois Central R.R., supra, 341 I.C.C. at 650. In addition to the penalty against the shipper (or consignee) contained in the amount of the charges, a penalty is effectively imposed upon the carrier where it is responsible for the shipper's retention--for example, where yard congestion prevents prompt loading or unloading. This is achieved by denying the carrier recovery of the entire demurrage charge--not merely the penalty portion but the compensatory element as well--when the carrier is the cause of the delay. It is the absence of this remission feature in the charges at issue here that is the central feature of petitioners' complaint.
 
 
 18
 The Commission asserts that, unlike these ordinary storage and demurrage charges, the present charges contain no penal element. This seems to us not a response to the petitioners' complaint but merely a restatement of it. Granted that the carriers have chosen not to include within the present tariffs the separate penalty charge that ordinarily accrues to their benefit;[5] that does not justify elimination of the penalty feature (denial of compensatory payment) which accrues to the benefit of the shippers. That is especially the case since in the distinctive circumstance of assigned cars the carriers have no need of a penalty whereas the shippers do. When the assigned cars lie idle due to the fault of the shippers, the carriers are not necessarily harmed. If the daily storage charges that accrue during that period are less than fully compensatory, that is the carriers' own choice.[6] Moreover, even assuming an undercharge, the overall amount the carrier will lose as a consequence seems predetermined by the number of assigned cars (which is again within the carriers' control)[7] and unaffected by the inefficient manner in which the shipper may use them. Given a certain level of production, the cars will be in line-haul service for only so many runs, and will lie idle (or subject to normal demurrage charges) for so many days, regardless of how the runs and idle days are distributed. The shipper, by contrast, continues to need a penalty as a deterrent against carrier-produced harm that is beyond his control. In the assigned-car context as in any other, carrier-produced delay disrupts production schedules, causes irregular deliveries, and perhaps reduces sales. Indeed, there is arguably a greater-than-ever need for shipper protection in the assigned-car context: The carrier is more likely to place the assigned-car shipper's service needs at the bottom of the list, since such a shipper is more likely to represent a captive market.[8] It is not reasonable, therefore, to say that simply because the carriers have chosen not to assess a penalty they need not be subject to one.
 
 
 19
 The Commission's justification quoted above also asserts that the present charges "have a different purpose" from normal demurrage or storage charges. Though the point is not made explicitly in the Commission's opinion, this perhaps refers to the fact that the penalty element of normal demurrage charges (both the discrete penalty charge assessed against the shipper and the penalty assessed against the carrier which consists of forfeiture of compensation) is intended, in the words of the Commission's leading case, "to ensure prompt return of the equipment to public service." Ormet Corp. v. Illinois Central R.R., supra, 341 I.C.C. at 650. When cars have been assigned, it can be asserted, it is not the delay which prevents their "prompt return to public service" but the very fact of assignment. Even if they were used promptly they would, immediately following use, revert to assigned and idle status. This argument overlooks the fact that efficient use will ultimately reduce the total number of assigned cars. If the shipper must assume erratic service, he may request a number of cars which, even if provided erratically, may suffice for his needs. More fundamentally, the Commission's own opinion belies the suggestion that return of equipment to public service is the exclusive purpose of demurrage charges, and the assurance of efficient carrier service merely an incidental benefit. The Commission specifically notes that "once ... assigned cars ... are placed for loading, demurrage is applicable and may be assessed to encourage the prompt release of cars either for a line-haul movement or back to storage." Dana II at 9 n. 9, Supp.Jt.App. at unnumbered page between 874 and 875, n. 9. In this situation the charge obviously has no effect upon the return to public service (assuming, as the Commission does, that the indirect effect just discussed does not count) and is exclusively designed to enable the railroads to recommence collection of their storage charges and to enable the shipper to obtain efficient service.
 
 CONCLUSION
 
 20
 It is ultimately unrealistic, however, to discuss this matter in the framework of "penalty," as the Commission has chosen to do. The remission of the carrier's compensatory charge in demurrage and other storage cases is less a penalty than it is the cancellation of unjustified payment for a use of facilities or equipment that has not occurred or has not been voluntary. The same situation exists here. Fundamentally, the petitioners are not seeking any "penalty" windfall, but simply want to be relieved of charges for "use" of cars that in fact never occurred. The idle cars, delivered too late for earlier loading as a result of the carriers' fault, were in fact not serving the shippers' convenience--just as in the ordinary demurrage situation a car waiting for loading because of yard congestion is not doing so. The charge for equipment use prevented by the carrier's own fault is an unreasonable rate in violation of 49 U.S.C. Sec. 10701 (Supp. IV 1980), and the Commission's action failing to disapprove it is contrary to law.
 
 
 21
 We would feel less confident in setting aside this decision--which rests upon a judgment that is asserted to be policy-related--if the decisional process did not bear so much evidence that the suit was cut to fit the cloth. In their briefs, petitioners protest the fact that the deus ex machina of "nonpenalty" storage charges was lowered into the proceeding at the last stage--after decisions by an administrative law judge and the Commission's Review Board had found in their favor, and after the Commission's original decision against them, based on other grounds, was challenged in this court. There is nothing inherently invalidating about what the petitioners call "the Commission's redefinition of the issues" in its last opinion, Petitioners' Brief at 18; the agency is entitled to have second thoughts, and to sustain action which it considers in the public interest upon whatever basis more mature reflection suggests. It can mend its hold. In the present case, however, that hold remains an unorthodox one, and the prior history of the match permits us to rule it out without severe misgiving.
 
 
 22
 We hold that the Commission cannot approve these storage charges in gross as reasonable per se, but must permit the shippers to show that, in particular instances, the idle-car time for which charges are assessed is attributable to the fault of the carriers.
 
 
 23
 Petition granted.
 
 
 
 [1]
 The Commission rescinded these Car Service Rules in 1980. Ex Parte No. 241 (Sub-No. 1), Investigation of Adequacy of Railroad Freight Car Ownership, Car Utilization, Distribution Rules, and Practices, 362 I.C.C. 844 (1980). The rescission increased rather than reduced the carriers' control over car assignment, since its purpose was "to return the car distribution power to the industry." Id. at 873
 
 
 [2]
 Petitioners' complaint cited the section numbering scheme created by the original 1887 Act. Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887). Before the complaint was filed, Congress had reorganized the Act and enacted it into positive law. Act of October 17, 1978, Pub.L. No. 95-473, 92 Stat. 1337. This codification did not affect the parties' substantive rights, however, since it "may not be construed as making a substantive change in the laws replaced." Id. at Sec. 3(a), 92 Stat. at 1466
 
 
 [3]
 The cost determination was based upon the railroads' average costs for all the car types covered by the charges. The Commission left it open to petitioners to argue (which they had not) that different rates should be established for each car type. Supp.Jt.App. at 880
 
 
 [4]
 See generally National Association of Recycling Industries v. ICC, 627 F.2d 1328, 1334 (D.C.Cir.1980), modified on other grounds, 449 U.S. 609, 101 S.Ct. 775, 66 L.Ed.2d 776 (1981); Trans-Pacific Freight Conference of Japan/Korea v. FMC, 650 F.2d 1235, 1251 (D.C.Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2315, 68 L.Ed.2d 840 (1981); Pacific Legal Foundation v. Department of Transportation, 593 F.2d 1338, 1343 n. 35 (D.C.Cir.), cert. denied, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979); Ethyl Corp. v. EPA, 541 F.2d 1, 33-37 (D.C.Cir.) (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); Associated Industries v. Department of Labor, 487 F.2d 342, 349-50 (2d Cir.1973); City of Chicago v. FPC, 458 F.2d 731, 744-45 (D.C.Cir.1971); K. DAVIS, 1 ADMINISTRATIVE LAW TREATISE Sec. 6.6 at 468, Sec. 6.13 at 512 (2d ed. 1978); B. SCHWARTZ, ADMINISTRATIVE LAW 604-06 (1976)
 
 
 [5]
 The Commission found that the $10.00 tariff "does not cover the average daily car-hire cost to the carriers of $10.65." Dana II at 8-9, Supp.Jt.App. at 874-75
 
 
 [6]
 Recent legislation not only permits but encourages the assessment of fully compensatory charges. The Railroad Revitalization and Regulatory Reform Act of 1976 required the Commission "to ... promote separate pricing of distinct rail and rail-related services." 45 U.S.C. Sec. 801(b)(5) (1976). See also U.S.C. Sec. 10728(b) (Supp. IV 1980) (Commission "shall maintain expeditious procedures to permit separate rates for distinct rail services"). The Staggers Rail Act of 1980 required that rail tariffs "identify plainly ... storage ... charges (stated separately)." 49 U.S.C. Sec. 10762(b)(1) (Supp. IV 1980). The Commission's second opinion assigns a public policy purpose to the carriers' charging of less than fully compensatory rates--namely, that it serves as an incentive to the carriers not to permit an excessive number of cars to enter assigned service. We know of no prior Commission action requiring this coercive device; and it is quite an arbitrary one if (as is the case) the Commission does not prescribe any particular degree of undercharge, but is simply content if the storage charge is (as it said in its first opinion) "something less than the average rental or lease charge paid by the railroads," Dana I at 3-4, Jt.App. at 794-95, or "between zero and a level equal to ownership costs." Id. at 4, Jt.App. at 795
 
 
 [7]
 See page 1299 & note 1, supra
 
 
 [8]
 The administrative law judge found that the percentage of gear-frame traffic carried by the defendant railroads in 1977 was above 96% (and as high as 100%) from all points of origin except two, where it was 82.3% and 89.7%, respectively. ALJ Opinion at 6, Jt.App. at 693. Motor carrier transport from various points of origin was from 37% to 240% more expensive, not including additional internal costs which that mode of shipment imposes. Id. at 7, Jt.App. at 694